UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

XIAOHUI ZHAO-ROYO,

                          Plaintiff,

                                                 1:14-CV-0935
v.                                                (GTS/CFH)

NEW YORK STATE EDUC. DEP'T,

                          Defendant.

_____

APPEARANCES:                             OF COUNSEL:

SOLOMON LAW FIRM, PLLC           ARIEL E. SOLOMON, ESQ.
  Counsel for Plaintiff
300 Great Oaks Blvd., Suite 313
Albany, New York 12203

ERIC T. SCHNEIDERMAN             JUSTIN L. ENGEL, ESQ.
Attorney General for the State of New York     Assistant Attorney General
  Counsel for Defendant
The Capitol
Albany, New York 12224

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

      Currently before the Court, in this employment discrimination action filed by Xiaohui

Zhao-Royo ("Plaintiff") against the New York State Education Department ("Defendant" or

"NYSED"), is Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt.

No. 21.) For the reasons set forth below, Defendant's motion is granted.

# I. RELEVANT BACKGROUND

## A. Plaintiff's Verified Complaint

Generally, in her Verified Complaint, Plaintiff alleges that, between approximately March 2013 and July 2013, she was subjected to discrimination, retaliation, and a hostile work environment during her employment with NYSED in numerous ways, including, but not limited to, the following: (1) abusive and berating language on a near-daily basis; (2) physical contact (specifically, ripping papers from her hands for no apparent reason); (3) knowingly false accusations of work-related mistakes and reprimands based on those false accusations; (4) attempts to destroy her work by the intentional deletion of computer files containing information gathered in the course of her duties; (5) rules imposed against her only, including rules limiting her contact with a supervisor to e-mail, due to Plaintiff's accent, national origin, and her efforts to report other instances of discriminatory behavior toward her; (6) a failure by Defendant to take effective action to stop such harassment; and (7) termination of her probationary employment based on a false accusation that she acted in an inappropriate, intimidating, and insubordinate manner toward a male manager on an occasion when she sought to discuss falsehoods contained in her performance evaluation. (*See generally* Dkt. No. 1 [Plf.'s Verified Compl.].)

Based on these allegations, Plaintiff asserts three claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, set forth in a single "Cause of Action": (1) a claim that Defendant[1] discriminated against her on the basis of her race (Asian), national origin

---

[1] The caption of Plaintiff's Verified Complaint lists only NYSED as a defendant, but the "Parties" section of the Verified Complaint alleges that "Defendant ANTHONY LOFRUMENTO . . . [w]as Secretary of [NYSED], and is being sued herein, in his official

(Chinese), and sex; (2) a claim that Defendant subjected her to a hostile work environment on the basis of her race, national origin, and sex; and (3) a claim that Defendant retaliated against her for raising complaints about this discrimination. (*Id.* at ¶¶ 12-101.)

## B. Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported by Defendant in its statement of material facts and expressly admitted by Plaintiff in her response thereto.[2]

---

capacity as the agency head of [NYSED] . . . ." (Dkt. No. 1 at ¶ 11.) Even if Lofrumento was named as a defendant in this case and received adequate notice of that fact, however, Plaintiff's claims against him must be dismissed because "Title VII does not impose liability on individuals[.]" *Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012); *accord, Sassaman v. Gamache*, 566 F.3d 307, 315-16 (2d Cir. 2009); *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004).

[2]    With respect to many of Defendant's factual assertions, Plaintiff "[d]en[ies] that the statement[s are] relevant or material[.]" (*See, e.g.,* Dkt. No. 29, Attach. 1, at ¶¶ 2-10, 12-22 [Plf.'s Rule 7.1 Response].) It is axiomatic that a party may not be awarded summary judgment on the basis of undisputed *immaterial* facts. As a result, a party opposing a motion for summary judgment may certainly object that particular facts (disputed or undisputed) are immaterial to the motion. However, a non-movant denying a movant's factual assertion in a statement of facts is required to support that denial by "set[ting] forth a specific citation to the record where the *factual* issue arises." N.D.N.Y. L.R. 7.1(a)(3) (emphasis added). Moreover, "[t]he Court shall deem admitted any properly supported facts set forth in the [moving party's] Statement of Material Facts that the [non-moving] party does not specifically controvert." *Id.* Simply stated, regardless of whether some or all of the facts to which Plaintiff responds as set forth above are immaterial for purposes of Defendant's motion for summary judgment, the issue of whether those *facts* are properly *disputed* is a separate matter. As for materiality, the materiality of an assertion of fact on a motion for summary judgment is a legal conclusion to be made by the Court. *See, e.g., Davis v. United States*, 11-CV-1211, 2015 WL 11142426, at *2, n.2 (N.D. Ga. March 31, 2015) ("[M]ateriality . . . [is] . . . a legal conclusion to be made by the Court . . . ."); *cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("As to materiality, the substantive law will identify which facts are material."). As a result, where a non-movant has merely objected to the materiality of a fact, and the Court has concluded that the fact is material, the fact will be deemed admitted. *See, e.g., Newmark v. Lawrence Hosp. Ctr.*, 07-CV-2861, 2008 WL 5054731, at *8, n.7 (S.D.N.Y. Oct. 20, 2008) (finding two material facts admitted where the non-movant merely objected to the materiality of the facts); *accord, Bourne Co. v. Hunter Country Club, Inc.*, 990 F.2d 934, 938 (7th Cir. 1993); *Lee v. Univ. Underwriters Ins. Co.*, 12-CV-3540, 2014 WL 11858159, at *1 (N.D. Ga. June 25, 2014); *Cunningham v. Enter. Rent-a-Car Co.*, 07-CV-1615, 2010 WL 724507, at *2, n.3 (W.D. Pa. Mar. 1, 2010).

(*Compare* Dkt. No. 21, Attach. 2 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 29, Attach. 1 [Plf.'s Rule 7.1 Response].)

<u>Commencement of Plaintiff's Employment</u>

1.      Plaintiff was appointed as a Program Research Specialist 2 at salary grade 18 for NYSED, effective August 9, 2012.

2.      Plaintiff's appointment was subject to a probationary period of 26 to 52 weeks. As a probationary employee, Plaintiff's services could be terminated at any time after the eighth week of her appointment and during the remainder of the maximum probationary period of 52 weeks.

3.      The majority of probationary periods at NYSED last for 52 weeks (one year). Employees who are grade 13 or below and employees who are transferred or promoted are subject to a reduced probationary period of 26 weeks.[3]

---

[3]      Plaintiff purports to "deny that the assertions set forth [in paragraph 3 of Defendant's statement of material facts] are uncontroverted, material facts," but then concludes her response by stating "otherwise, admit," and cites no record evidence in support of her initial (nonspecific) denial.  (Dkt. No. 29, Attach. 1, at ¶ 3 [Plf.'s Rule 7.1 Response].)  The fact asserted by Defendant will be deemed admitted for each of two reasons.  First, Plaintiff's ultimate response is to "admit" the fact asserted by Defendant, notwithstanding the inclusion of any additional legal argument in her response.  *Cf. Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit'"); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider the statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed'").  Second, even if Plaintiff could be understood to deny Defendant's factual assertion, she has failed to cite record evidence supporting her denial or controverting the fact asserted.  *See Aktas v. JMC Dev. Co., Inc.*, 877 F. Supp. 2d 1, 5 n.3 (N.D.N.Y. 2012) (D'Agostino, J.) (accepting the third-party defendants' statement of material facts as true because the defendant/third-party plaintiff failed to respond to it in accordance with Local Rule 7.1[a][3]); *Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F. Supp. 2d 315, 319 (S.D.N.Y. 2003) (holding that "the facts set forth in [plaintiff's] statement are deemed established" where defendant denied assertions in plaintiff's Rule 56.1 statement but declined to provide record citations in support).

4.      The probationary period is considered to be the final step in NYSED's recruitment process, and provides an opportunity for both the employer and the employee to determine if the employee is a good fit.

5.      Plaintiff was assigned to work in NYSED's Office of Information and Reporting Services ("OIRS").[4]

6.      OIRS is generally responsible for the collection and reporting of educational data for school districts, public schools, charter schools, and nonpublic schools in New York State. OIRS maintains educational data on NYSED's website and responds to data requests made by other departments within NYSED, other government agencies, the public, the legislature, and the media.

7.      As a Program Research Specialist 2 in OIRS, Plaintiff was responsible for, among other things, assisting in the conducting of NYSED's data collection, reporting, and analysis activities.

8.      Plaintiff's primary job duties were to produce reports on educational data and to respond to requests for educational information.

9.      Work within OIRS was generally assigned to staff members (such as Plaintiff) in one of two ways.  First, supervisors directly assigned certain requests for information to particular staff members to complete.  Second, OIRS maintained a generic e-mail inbox, called

---

[4]      Plaintiff's response to Defendant's factual assertion (1) purports to "[d]eny that [the factual assertion] is relevant or material," (2) refers the Court to the record evidence cited by Defendant "for the specific contents thereof," (3) concludes with the words "but otherwise admit," and (4) provides additional citations to record evidence that neither support nor controvert the fact asserted by Defendant.  (Dkt. No. 29, Attach. 1, at ¶ 5.)  Unless otherwise noted in this Decision and Order, the Court will deem admitted any facts asserted by Defendant (with citation to supporting record evidence) which Plaintiff's response "admit[s]," notwithstanding its inclusion of superfluous commentary, legal argument, inaccurate record citations, or improperly asserted additional facts.

Dataquest, which was used to transmit, and respond to, requests for information. Occasionally, staff members also received direct phone calls or e-mails from others within NYSED requesting information.

10. Generally, assignments that came through Dataquest were less comprehensive and complex than those assigned directly by supervisors.[5]

<u>Plaintiff's Work Under Her First Supervisor, Ellen Martin</u>

11. From the date of her appointment on August 9, 2012, until mid-April 2013, Plaintiff was supervised by Ellen Martin ("Martin"), an assistant data director for NYSED.[6]

---

[5] Plaintiff purports to deny Defendant's factual assertion and cites "the record in its entirety" in support of both her denial and her related assertion that "[a] searching review of the record . . . establishes that these assertions are not sufficiently supported to warrant a finding that they constitute uncontroverted material facts." (Dkt. No. 29, Attach. 1, at ¶ 10 [Plf.'s Rule 7.1 Response].) In light of the record evidence cited by Defendant in support of its factual assertion (which, by its own terms, addresses only "[g]enerally" the relative comprehensiveness and complexity of work assignments originating from Dataquest), including Plaintiff's own deposition testimony, the Court finds that Defendant has sufficiently supported its factual assertion. (Dkt. No. 21, Attach. 2, at ¶ 10 [Def.'s Rule 7.1 Statement].) Mindful that Fed. R. Civ. P. 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute," *Morales v. New York State Dep't of Labor Div. of Emp't Servs.*, 530 F. App'x 13, 14 (2d Cir. 2013) (summary order), the Court further finds that Plaintiff's (counseled) citation to "the record in its entirety" is insufficient to controvert Defendant's factual assertion. (*Id.*) *See also* N.D.N.Y. L.R. 7.1(a)(3) ("Each denial shall set forth a *specific* citation to the record where the factual issue arises.") (emphasis added).

[6] Plaintiff purports to deny this fact to the extent that it asserts that, "after April 2013[, Martin] did not continue to have some supervisory responsibilities with respect to [Plaintiff's] employment," but "otherwise admit[s]" the fact. (*Compare* Dkt. No. 21, Attach. 2, at ¶ 11 [Def.'s Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 11 [Plf.'s Rule 7.1 Response].) The fact asserted by Defendant will be deemed admitted for each of two reasons. First, to the extent that Plaintiff may be understood to deny a fact merely *implied* by Defendant, her denial is insufficient to create a genuine dispute with respect to the fact that Defendant actually asserts. *See Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (Suddaby, J.) (citing authority for the point of law that the summary judgment procedure involves the disputation of *asserted* facts, not the disputation of *implied* facts); *cf. Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials . . . improperly

12.     Martin worked closely with Plaintiff during the first six months of Plaintiff's employment; as Martin testified in her deposition, she "mentor[ed]" Plaintiff and gave her work assignments that "were probably much more simple[.]"[7]

13.     After the first six months of Plaintiff's employment, Martin began giving Plaintiff "more complex" projects that were to be completed independently.[8]

14.     When Martin began assigning Plaintiff more complex projects, she observed deficiencies in Plaintiff's work performance.[9]

15.     For example, Plaintiff failed to complete an assignment for the New York State Statistical Yearbook ("Yearbook") that was given to her in March 2013.  More specifically, Martin became aware that the work was not being completed when she was contacted by the Yearbook editor and advised that the editor had not received any of the tables that were

---

interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts"). Second, even if Plaintiff had properly denied any portion of the fact asserted by Defendant, she has failed to cite any record evidence, supporting or otherwise, as required by Local Rule 7.1(a)(3).  *See, supra,* note 3 of this Decision and Order.

[7]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 12 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 12 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].)  *See also, supra,* note 6 of this Decision and Order.

[8]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 13 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 13 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].)  *See also, supra*, note 6 of this Decision and Order.

[9]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 14 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 14 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].)  *See also, supra*, note 6 of this Decision and Order.

expected.[10]

16.     When Martin questioned Plaintiff about her failure to complete the Yearbook assignment, Plaintiff responded that the deadline had passed and that she made the decision not to complete the work. However, the initial deadline was only a guideline, and the work had to be reassigned to several staff members in order to make up the time lost.[11]

17.     In February 2013, Plaintiff was assigned a project related to a request from the National Assessment for Educational Progress ("NAEP"). Plaintiff did not make sufficient progress in completing the project tasks, but rather approached Martin about making changes to the methodology that was being used to handle the project. Ultimately, due to the lack of progress, Martin had to reassign the work to other employees to complete.[12]

18.     On several occasions, Plaintiff complained that she was the only employee to be assigned work through Dataquest. However, Dataquest was used to assign work to all staff

---

[10]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 15 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 15 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact]; *accord, e.g.,* Dkt. No. 21, Attach. 7, at 112 [Martin Depo. Tr.].) *See also, supra*, note 6 of this Decision and Order.

[11]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 16 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 16 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].) *See also, supra*, note 6 of this Decision and Order.

[12]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 17 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 17 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].) *See also, supra*, note 6 of this Decision and Order.

members.[13]

19.    Moreover, Plaintiff increasingly made unreasonable demands on Martin's time. Plaintiff would not be able to disengage even after lengthy conversations, and Martin would tell Plaintiff that she had other tasks to attend to.  On several occasions, Martin had to ask Plaintiff to leave her office.[14]

20.    Plaintiff also made insulting remarks about Martin and at least one other coworker in Martin's presence.[15]

21.    On one occasion, Martin asked Plaintiff to produce e-mail responses to work assignments that were in Plaintiff's Dataquest mailbox in order to show that Plaintiff had acknowledged receipt of those assignments that she was unable to complete right away.  In response, Plaintiff told Martin that her reading skills were poor or inadequate (or something of that nature).[16]

---

[13]    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 18 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 18 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].)  *See, supra*, note 6 of this Decision and Order.

[14]    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 19 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 19 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].)  *See, supra*, note 6 of this Decision and Order.

[15]    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 20 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 20 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].)  *See, supra*, note 6 of this Decision and Order.

[16]    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 21 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 21 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].)  *See also, supra*, note 6 of this Decision and Order.

22.     On another occasion, Plaintiff insulted the intelligence of a coworker in the presence of other staff members.[17]

23.     In short, based upon Martin's supervision of Plaintiff, she found that Plaintiff had difficulty accepting directions, did not have a positive working relationship with her co-workers, and was not a team player.[18]

### February-March 2013 – Conflicts Between Plaintiff and Her Coworkers

24.     Generally, for the first several months of Plaintiff's employment, her interactions with her coworkers were friendly.

25.     Around February or March 2013, Plaintiff began having conflicts with certain coworkers.[19]

26.     For example, in February 2013, Plaintiff asked Suzanne Holliday ("Holliday"), a calculations clerk, to put Plaintiff on the office calendar for a vacation of several weeks to China. When Holliday informed Plaintiff that Plaintiff needed to speak with her supervisor, Plaintiff stated that she had already been told that she did not have enough vacation time, but that she

---

[17]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 22 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 22 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].)  *See also, supra,* note 6 of this Decision and Order.

[18]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 23 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 23 [Plf.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

[19]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 25 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 25 [Plf.'s Rule 7.1 Response, denying that above-stated fact is "relevant or material," and then purporting to "admit" a fact not asserted by Defendant (i.e., that Defendant "treated [her] in an adverse and hostile manner") without citation to record evidence].)

could, perhaps, take vacation time without pay.  Plaintiff stated that she was being treated unfairly because another employee, Adeline Jebaraj, was allowed to take time to go to India, was not as qualified as Plaintiff, and held a "degree [that] was not worth as much."[20]

27.     Plaintiff testified that Holliday yelled at her during their interaction and accused her of "digging [for] information."

28.     On one occasion in March 2013, Plaintiff had an altercation with Cheryl Mitchell ("Mitchell"), an Education Program Aid for NYSED.  More specifically, Plaintiff testified in her deposition that she approached Mitchell and attempted to ask her clarifying questions about an assignment, and Mitchell became angry and yelled, "You are [a] statistician.  I cannot do statistics.  Why [do] you ask me?"[21]

29.     At some other point in March 2013, Plaintiff and Mitchell had an extended conversation regarding Plaintiff's ideas and how OIRS "didn't do things in the most productive way."  During that conversation, Mitchell stated several times that Plaintiff's ideas may be good but that Plaintiff should discuss them with management.[22]

---

[20]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 26 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 26 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].)  *See also, supra,* note 6 of this Decision and Order.

[21]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 28 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 28 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact]; *accord*, Dkt. No. 21, Attach. 4, at 48 [Plf.'s Depo. Tr.].)  *See also, supra*, note 6 of this Decision and Order.

[22]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 29 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 29 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].)  *See also, supra*, note 6 of this Decision and Order.

30.     On April 1, 2013, Mitchell sent Plaintiff an e-mail message stating that, while she felt that Plaintiff may have some good ideas, Plaintiff needed to address them with her supervisors.  Mitchell also indicated that she was not comfortable with Plaintiff stating in any written documentation that she agreed with Plaintiff's ideas.[23]

31.     Plaintiff testified in her deposition that she believed that Mitchell's e-mail was intended "to abuse [and] harass [her and] to make trouble."

32.     In early April 2013, Plaintiff entered Mitchell's office area and "yelled at" Mitchell "for stealing her ideas and trying to take credit for her work."  Mitchell asked Plaintiff to leave her office area, but Plaintiff initially refused.  Plaintiff eventually left the third time that Mitchell asked her to leave.[24]

33.     Plaintiff testified in her deposition that, during this incident, Mitchell yelled at her, changed subjects by accusing her of giving the wrong information to a customer, and told her to get out of Mitchell's office.

---

[23]     In response to this factual assertion, Plaintiff "admit[s that] Mitchell sent [her] an email on April 1, 2013."  (Dkt. No. 29, Attach. 1, at ¶ 30 [Plf.'s Rule 7.1 Response].)  To the extent that Plaintiff may be understood to deny this factual assertion in part, her partial denial is ineffective for each of three alternative reasons.  First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3).  Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3).  Third, Plaintiff has failed to cite any record evidence supporting her partial denial or controverting the fact asserted.  Rather, Plaintiff refers the Court to the e-mail message at issue, which is consistent with the characterization of the e-mail message set forth in Defendant's factual assertion.  (Dkt. No. 21, Attach. 2, at ¶ 30 [Def.'s Rule 7.1 Statement].)

[24]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 32 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 32 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact]; *accord*, Dkt. No. 21, Attach. 18, at NYSED000074 [Mitchell Aff.].)  *See also, supra*, note 6 of this Decision and Order.

34.     Martin was apparently on vacation during this incident.  Upon returning from vacation, she was "made aware" by "multiple employees" that Plaintiff and Mitchell had a discussion in Mitchell's office, that the discussion "escalated" and "loud voices" were used, and that Mitchell asked Plaintiff "several" times to leave Mitchell's office.[25]

35.     Martin met with Plaintiff and Mitchell separately and counseled them both about her expectations for professional behavior in the office and respect for coworkers.[26]

36.     Despite this counseling, Plaintiff visited several other coworkers at their work stations and attempted to persuade them to take "her side" with respect to this incident during working hours, resulting in disruption to office dynamics and distraction in the workplace.[27]

37.     Moreover, after Martin counseled Plaintiff, she sent an e-mail to Martin and visited her office several times in an effort to further discuss her confrontation with Mitchell.[28]

---

[25]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 34 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 34 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].)  *See also, supra*, note 6 of this Decision and Order.

[26]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 35 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 35 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].)  *See also, supra*, note 6 of this Decision and Order.

[27]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 36 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 36 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].)  *See also, supra*, note 6 of this Decision and Order.

[28]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 37 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 37 [Plf.'s Rule 7.1 Response, denying above-stated fact, but failing to cite record evidence actually supporting denial of above-stated fact].)

38.     For example, on April 2, 2013, Plaintiff sent Martin an e-mail asserting that she did not raise her voice or speak to any colleague "with an unreasonable, unprofessional manner."[29]

39.     Martin responded that the point of the counseling "was to share with [Plaintiff], and with others, [Martin's] expectations for the office" and "to ensure a professional and collegial work environment for us all."  Plaintiff replied to Martin's e-mail on the same day, and thanked Martin "for taking time to read [her] email and understand [her] better."

40.     Plaintiff testified in her deposition that she believed that Martin treated her unfairly and "differently than the Caucasians employees" with regard to this incident.  However, Plaintiff further testified that she did not know what Martin discussed with Mitchell in connection with this incident.[30]

41.     According to Plaintiff, she was also subjected to harassment by Martin between April 2 and April 4, 2013.  More specifically, Plaintiff testified in her deposition that, on these dates, Martin harassed her by repeatedly telling her that she had given incorrect information to a customer, and instructing her to send data to the customer.  However, Plaintiff testified that she had not given incorrect information to the customer, and that she called the customer and verified that he or she had not actually requested any specific data.[31]

---

[29]     (Dkt. No. 21, Attach. 5, at 7 [pagination generated by CM/ECF] [Def.'s  Depo. Ex. 5].)

[30]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 40 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 40 [Plf.'s Rule 7.1 Response, purporting to "admit only" a fact not asserted by Defendant (i.e., that Plaintiff also testified that she believed that Martin credited Mitchell's allegedly false account of the incident, in which Mitchell purportedly blamed Plaintiff for the "noise" of their confrontation)]; *accord*, Dkt. No. 21, Attach. 4, at 75 [Plf.'s Depo. Tr.].)

[31]     (Dkt. No. 21, Attach. 4, at 76-80 [Plf.'s Depo. Tr.].)

42.     Plaintiff testified that there were "many" other instances between February 2013

and April 2013 during which she felt that she was being treated unfairly "because [she was] a

Chinese," including (1) being "yelled at" for "ask[ing] a simple question," and (2) being

"ignore[d]" by other employees who came to her office to speak with her officemate.  However,

Plaintiff was unable to identify any other incident with greater particularity.[32]

43.     Plaintiff did not complain to Martin that she was being discriminated against or

treated unfairly because of her race or national origin.[33]

44.     On April 4, 2013, Plaintiff called Defendant's human resources "general" number

to express her concerns.  Plaintiff was directed to David Mahoney ("Mahoney"), then an

associate personnel administrator for NYSED.[34]

45.     Mahoney referred Plaintiff to his supervisor, Steven Earle ("Earle"), Director of

NYSED's Office for Diversity, Ethics and Access.  On the same day, Plaintiff called Earle and

---

[32]     (Dkt. No. 21, Attach. 4, at 84-87 [Plf.'s Depo. Tr.].)

[33]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 43 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 43 [Plf.'s Rule 7.1 Response, purporting to deny a fact not asserted by Defendant (i.e., the implication that Martin "was not aware of" Plaintiff's allegations of discrimination against Martin)].)  *See also Yetman*, 2015 WL 4508362, at *10 (citing authority for the point of law that the summary judgment procedure involves the disputation of *asserted* facts, not the disputation of *implied* facts); *cf. Baity*, 51 F. Supp. 3d at 418 (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials . . . improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts").

[34]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 44 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 44 [Plf.'s Rule 7.1 Response, purporting to deny a fact not asserted by Defendant (i.e., the implication that Plaintiff's allegations "amount only to 'concerns about her interactions with coworkers and her supervisor'")].)  *See also Yetman*, 2015 WL 4508362, at *10; *Baity*, 51 F. Supp. 3d at 418.

made an appointment to meet with him.[35]

46.     On April 4, 2013, following her initial conversation with Mahoney, Plaintiff sent him a follow-up e-mail complaining about the fact that Martin asked her to be professional in the office and made "unreasonable" demands of her after Martin spoke with Mitchell.  In the e-mail, Plaintiff did not make an allegation of discrimination.[36]

47.     Before her appointment with Earle, Plaintiff sent Earle a note reporting alleged "office harassment and power abuses behavior [*sic*]" by Mitchell and Martin.  The note referred to the incident that had occurred on April 4, 2013, during which Martin had allegedly directed Plaintiff to send data to a customer who had not requested it.  In the letter, Plaintiff did not allege that she had been subjected to discrimination.[37]

48.     NYSED has a written nondiscrimination policy prohibiting it from discriminating on the basis of, *inter alia*, national origin, race, or gender.[38]

---

[35]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 45 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 45 [Plf.'s Rule 7.1 Response, purporting to admit that Plaintiff "contacted Mr. Earle in his capacity as the individual who handled complaints of discrimination"].)  To the extent that Plaintiff may be understood to deny any portion of the fact asserted by Defendant, her partial denial is ineffective for each of three alternative reasons.  First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3).  Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3).  Third, Plaintiff has failed to cite any record evidence supporting her partial denial or controverting the fact that Defendant actually asserts.  Moreover, to the extent that Plaintiff may be understood to deny a fact merely *implied* by Defendant (i.e., that Plaintiff contacted Earle for a purpose exclusive of any complaints of discrimination), her denial is insufficient to create a genuine dispute with respect to the fact that Defendant actually asserts.  *See Yetman*, 2015 WL 4508362, at *10; *Baity*, 51 F. Supp. 3d at 418.

[36]     (Dkt. No. 21, Attach. 22, at 1 [Plf.'s E-mail to Mahoney, dated 4/4/2013].)

[37]     (Dkt. No. 21, Attach. 5, at 9 [Def.'s Depo. Ex. 6].)

[38]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 48 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 48 [Plf.'s Rule 7.1 Response, purporting to deny a fact not asserted by Defendant (i.e., the implication that "Defendants" were trained in how to follow, and followed, the policy)].)  *See also Yetman*, 2015 WL 4508362, at *10; *Baity*, 51 F. Supp. 3d at 418.

49.     Mr. Earle's responsibilities as Director of NYSED's Office for Diversity, Ethics and Access include, but are not limited to, addressing complaints of discrimination made by employees.  Mr. Earle also serves as the "point person" for mediating issues between NYSED management and staff members, among other things.[39]

50.     NYSED's Employee Handbook provides that, if an employee has a complaint that cannot be resolved through informal discussion with his or her supervisor or manager, the employee has the right to file a formal grievance.[40]

51.     On April 8, 2013, Plaintiff met with Earle.  During the meeting, Plaintiff discussed her complete professional history before joining NYSED, as well as her current work situation at NYSED.  The meeting, which Earle had scheduled for one hour, lasted for more than three hours.[41]

_____

[39]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 49 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 49 [Plf.'s Rule 7.1 Response, purporting to deny a fact not asserted by Defendant (i.e., the implication that Plaintiff "contacted [Earle] in any capacity other than [as] the person 'specializing' in complaints of discrimination")].)  *See also Yetman*, 2015 WL 4508362, at *10; *Baity*, 51 F. Supp. 3d at 418.

[40]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 50 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 50 [Plf.'s Rule 7.1 Response, purporting to "admit that there is a NYSED Employee Handbook regarding formal grievances"]; *accord*, Dkt. No. 21, Attach. 19, at NYSED000131].)  To the extent that Plaintiff may be understood to deny any portion of the fact asserted by Defendant, her partial denial is ineffective for each of three alternative reasons. First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3).  Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3).  Third, Plaintiff has failed to cite any record evidence supporting her partial denial or controverting the fact that Defendant actually asserts.

[41]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 51 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 51 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].)  *See also, supra*, note 6 of this Decision and Order.

52.     During the meeting, Plaintiff conveyed to Earle her perception that she was being harassed.  Plaintiff stated that she got along well with Martin during the first six months of Plaintiff's employment, but that the relationship became strained after Plaintiff persisted in presenting suggestions for changes in the processing functions of the office, with which Martin (at least partially) disagreed.  Plaintiff also stated to Earle that she had difficulties getting along with Mitchell during the same time period, and that Plaintiff's tension with Martin worsened after she began to complain about her interactions with Mitchell.[42]

53.     Plaintiff testified in her deposition that she reported to Earle that she "was subjected to abuses, harassment, and many use[s of] their power to oppress me," that she was not listened to, and that "they" treated her differently than other employees.[43]

54.     Plaintiff indicated to Earle that she felt that she could no longer trust or be supervised by Martin, and asked for a reassignment.  Earle explained the reassignment process and to whom Plaintiff should direct her request.[44]

_____

[42]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 52 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 52 [Plf.'s Rule 7.1 Response, purporting to "admit only" that she contacted Earle "regarding her perception that she was being harassed by Martin and Mitchell [due to] her [n]ational [o]rigin"].)  To the extent that Plaintiff may be understood to deny the fact asserted by Defendant, that denial is ineffective because (1) it does not specify what part of the fact is denied as required by Local Rule 7.1(a)(3), and (2) it is not supported by a record citation that actually supports the denial.

[43]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 53 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 53 [Plf.'s Rule 7.1 Response, purporting to "admit" a fact not asserted by Defendant (i.e., that "among [Plaintiff's] allegations [to Earle] were complaints of discrimination because of her national origin") and failing to deny above-stated fact].)

[44]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 54 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 54 [Plf.'s Rule 7.1 Response, purporting to "[a]dmit [that] Plaintiff requested a reassignment only"].)  To the extent that Plaintiff may be understood to deny this

55.     After the meeting with Earle, Plaintiff contacted the Deputy Commissioner's Office and requested a meeting to discuss her request to be assigned to a different supervisor and different office.

56.     Ken Wagner, Ph.D. ("Wagner"), served as Deputy Commissioner for NYSED's Office of Curriculum, Assessment and Educational Technology at the time.  Wagner asked Kathleen Moorhead ("Moorhead"), then the Data Systems Project Manager for NYSED and also a liaison to Wagner's Office, to address the issues raised by Plaintiff.

57.     On April 9, 2013, Plaintiff met with Moorhead for more than two hours.  During the meeting, Plaintiff complained that she was unhappy with her work environment and that Martin and Mitchell were confrontational and bully-like. She also indicated that she did not like the office or her current work assignments, and requested a transfer.

58.     Moorhead then met with Martin and Mitchell.  Martin and Mitchell provided an overview of their interactions with Plaintiff and stated that Plaintiff was "very hostile and angry toward them."  Moreover, Moorhead spoke with a number of other staff members who indicated that Plaintiff's description of an incident with Mitchell, in which Plaintiff alleged that Mitchell did not act professionally toward her, was "not accurate."[45]

---

factual assertion in part, her partial denial is ineffective for each of three alternative reasons. First, it fails to expressly state that any part of the fact is denied a required by Local Rule 7.1(a)(3).  Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3).  Third, Plaintiff has failed to cite any record evidence supporting her partial denial or controverting the fact asserted.

[45]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 58 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 58 [Plf.'s Rule 7.1 Response, "[d]eny[ing]" above-stated fact but failing to provide a specific citation to record evidence supporting the denial or controverting the fact asserted; citing, instead, Plaintiff's 216-page deposition transcript in its entirety]; *accord*, Dkt. No. 21, Attach. 18, at NYSED000036 ¶ 2 [Moorhead Aff.].)

59.     During the meeting, Moorhead advised both Martin and Mitchell that they needed to maintain a professional work environment and that they should contact Moorhead immediately with any concerns.

### The Decision to Assign Plaintiff to a New Supervisor

60.     On April 10, 2013, Moorhead met with Martin and Kristen DeSalvatore ("DeSalvatore"), then a Coordinator of Education Plans & Reports for NYSED, to discuss Plaintiff's concerns.  They agreed DeSalvatore, rather than Martin, would be Plaintiff's supervisor going forward.

61.     On the same date, Moorhead told Plaintiff that, from that date forward, Plaintiff would be reporting to DeSalvatore rather than Martin.

62.     Moorhead decided to assign Plaintiff to a new supervisor because, among other factors, there appeared to be a "personality conflict" between Plaintiff and Martin.[46]

63.     Wagner testified in his deposition that it was "extremely unusual" for NYSED to assign an employee to a different supervisor "based on something other than the workload changing."  Moreover, Wagner testified that the decision to transfer Plaintiff to a new supervisor was made in order to provide her with "an abundance of support" and "a fresh start."[47]

---

[46]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 62 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 62 [Plf.'s Rule 7.1 Response, denying that "the conflict was limited to a 'personality conflict'"].)  *See also Yetman*, 2015 WL 4508362, at *10; *Baity*, 51 F. Supp. 3d at 418.

[47]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 63 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 63 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact]; *accord*, Dkt. No. 21, Attach. 14, at 67-68, 84-85 [Wagner Depo. Tr.].)  *See also, supra*, note 6 of this Decision and Order.

64.    On April 10, 2013, Moorhead met with Plaintiff on two separate occasions to discuss the change in supervision. Initially, Plaintiff was not receptive and again requested a transfer.[48]

65.    On April 11, 2013, Plaintiff sent an e-mail to Moorhead (and by copy to Wagner), in which she (1) stated that she felt that she could not continue to work in the office with Mitchell and Martin, and (2) asked that Moorhead consider moving Plaintiff to another office. Plaintiff also asserted that Mitchell and Martin had "repeatedly mistreated [her] through harassing language, bullying, and power-abuse." Plaintiff identified the incident from April 4, 2013 as her reason for complaining to management. In her e-mail, did not expressly allege that she had been subjected to discrimination or retaliation.[49]

66.    Dr. Wagner responded to Plaintiff's e-mail, advising Plaintiff that transferring her was "not an option at this time" and directing Moorhead to address Plaintiff's concerns. As a matter of general practice, NYSED does not "transfer people" to other jobs.[50]

---

[48]    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 64 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 64 [Plf.'s Rule 7.1 Response, failing to respond in any manner to the fact asserted].)

[49]    (Dkt. No. 21, Attach. 5, at 11-12 [pagination generated by CM/ECF] [Def.'s Depo. Ex. 8].)

[50]    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 66 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 66 [Plf.'s Rule 7.1 Response, purporting to "admit [that] Moorhead was asked to address [P]laintiff's concerns"].) To the extent that Plaintiff may be understood to deny this factual assertion in part, her partial denial is ineffective for each of three alternative reasons. First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3). Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3). Third, Plaintiff has failed to cite any record evidence supporting her partial denial or controverting the fact asserted.

67.     In a responding e-mail, Plaintiff thanked both Wagner and Moorhead for their time and consideration, and, more particularly, thanked Moorhead for her "great and continuing efforts" and "the highly professional" and "caring and responsible" manner in which she attempted to "resolv[e] the matter[.]"[51]

68.     Over the next several days, Moorhead met with Plaintiff several times to listen to, and discuss, Plaintiff's concerns.  During these meetings, Plaintiff continued to raise issues regarding her past interactions with Martin and Mitchell.  Moorhead advised Plaintiff that she should contact human resources personnel if she wanted to file a formal complaint or grievance.[52]

69.     Plaintiff also contacted Dina Haggerty ("Haggerty"), a personnel administrator for P-12 Education at NYSED, regarding her reservations about being assigned to a new supervisor.  Shortly thereafter, Haggerty met with Plaintiff for nearly two hours, during which Plaintiff related the entire history of her career.[53]

---

[51]     (Dkt. No. 21, Attach. 5, at 11-12 [pagination generated by CM/ECF] [Def.'s Depo. Ex. 8].)

[52]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 68 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 68 [Plf.'s Rule 7.1 Response, purporting to deny a fact not asserted by Defendant (i.e., the implication that Plaintiff "met repeatedly with Moorhead after she was reassigned to DeSalvatore"), but failing to cite record evidence actually supporting denial, and in any event "otherwise admit[ting]" the fact asserted].)  *See also Yetman*, 2015 WL 4508362, at *10; *Baity*, 51 F. Supp. 3d at 418.

[53]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 69 [Def.'s Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 69 [Plf.'s Rule 7.1 Response, purporting to "deny that the assertions . . . are uncontroverted, material facts," but to "[a]dmit [that P]laintiff contacted Dina Haggerty"].)  To the extent that Plaintiff may be understood to deny this factual assertion in part, her partial denial is ineffective for each of two alternative reasons.  First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3).  Second, Plaintiff has failed to cite any record evidence supporting her partial denial or controverting the fact asserted, as also required by Local Rule 7.1(a)(3).

70.     After her meeting with Plaintiff, Haggerty spoke with Earle about Plaintiff's concerns.  Haggerty testified in her deposition that, based on their conversation, Haggerty and Earle determined that Earle should be the person to address Plaintiff's concerns that she was being harassed by her former supervisor (i.e., Martin) because he handled such allegations in his role as Diversity, Ethics and Access Officer for NYSED, and he had previously had contact with Plaintiff.[54]

71.     During a phone call between Haggerty and Plaintiff on the day after they met in person, Plaintiff expressed concern about her probationary period being extended if she was assigned to a new supervisor.  Haggerty referred Plaintiff to Earle with respect to her allegation that she was being harassed by Martin.

72.     On April 15, 2013, Plaintiff indicated to Moorhead that she felt better and was willing to move forward under a new supervisor.  At that point, Moorhead allowed DeSalvatore to handle things moving forward.[55]

---

[54]     (Dkt. No. 21, Attach. 2, at ¶ 70 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 70 [Plf.'s Rule 7.1 Response, purporting to "admit only" a fact not asserted by Defendant (i.e., that  "Haggerty spoke with Earle concerning Plaintiff's allegations of discrimination and harassment")]; *accord*, Dkt. No. 28, Attach. 2, at 26-28 [Haggerty Depo. Tr.].)

[55]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 72 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 72 [Plf.'s Rule 7.1 Response, purporting to "deny that the assertions . . . are uncontroverted, material facts," but to "[a]dmit only that [Plaintiff] was willing to attempt to move forward under a new supervisor and that she expressed her willingness to do so on April 15, 2013"].)   To the extent that Plaintiff may be understood to deny this factual assertion in part, her partial denial is ineffective for each of two alternative reasons.  First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3).  Second, Plaintiff has failed to cite any record evidence supporting her partial denial or controverting the fact asserted, as also required by Local Rule 7.1(a)(3).

73.     However, Plaintiff continued to request to meet with her. Plaintiff asked to meet with her "sometimes up to 5 times a day," even after Plaintiff had discussed the topics she wished to raise with DeSalvatore. Moreover, Plaintiff attempted to discuss "issues that did not pertain to the current work environment or situation."[56]

74.     Based on her interactions with Plaintiff, Moorhead concluded that Plaintiff was unable to respect other people's professional time.[57]

75.     Plaintiff also contacted her union representative, Michael Tracy-Ireland ("Tracy-Ireland"), to discuss the fact that she was not allowed to transfer to another office. On April 16, 2016, Tracy-Ireland advised Plaintiff that she should make the best of her current situation until her probationary period ended.

76.     In a subsequent e-mail to Tracey-Ireland, dated May 1, 2013, Plaintiff explained she had been transferred to the supervision of DeSalvatore, and that she "saw this as a positive change of prompt effort/action made . . . Ken Wagner's office, to help [her]."[58]

<u>Plaintiff's Work Under Her New Supervisor</u>

77.     DeSalvatore began supervising Plaintiff on April 12, 2013.

---

[56]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 73 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 73 [Plf.'s Rule 7.1 Response, denying above-stated fact, but failing to cite record evidence actually supporting denial of above-stated fact]; *accord,* Dkt. No. 21, Attach. 18, at NYSED000037 ¶ 5 [Moorhead Aff].)

[57]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 73 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 73 [Plf.'s Rule 7.1 Response, denying above-stated fact, but failing to cite record evidence actually supporting denial of above-stated fact].)

[58]     (Dkt. No. 21, Attach. 5, at NYSED001268 [Def.'s Depo. Ex. 9].)

78.     Under DeSalvatore's supervision, Plaintiff's "interpersonal relationships with [DeSalvatore] and fellow colleagues were typically difficult[.]"[59]

79.     Plaintiff had a hard time finding closure on the events that led to the change in supervision, despite the fact that DeSalvatore and Moorhead explained several times that she needed to stop discussing it and move on.[60]

80.     Plaintiff had continual difficulties having succinct conversations and bringing closure to conversations and would reiterate her points and repeat information she had already shared.[61]

81.     Plaintiff also had difficulties with respect to engaging other colleagues.  More specifically, if Plaintiff went to a colleague's desk and found that person away, on the telephone, or engaged in conversation, she would repeatedly return every five to ten minutes until she found

---

[59]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 78 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 78 [Plf.'s Rule 7.1 Response, denying above-stated fact, but failing to cite record evidence actually supporting denial of above-stated fact]; *accord,* Dkt. No. 21, Attach. 18, at NYSED000049 [DeSalvatore Aff.].)

[60]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 79 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 79 [Plf.'s Rule 7.1 Response, purporting to "[a]dmit only" an additional fact not asserted by Defendant (i.e., that Plaintiff "made additional allegations of discrimination after DeSalvatore was assigned as [her] supervisor) and failing to cite record evidence actually supporting any denial].)

[61]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 80 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 80 [denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact]; *accord,* Dkt. No. 21, Attach. 18, at NYSED000049 [DeSalvatore Aff.].)  *See also, supra*, note 6 of this Decision and Order.

the person available to speak.[62]

82.     Plaintiff complained to DeSalvatore about office operations and what Plaintiff perceived as inefficiencies.  Plaintiff also complained that she was being belittled and harassed by Mitchell.

83.     DeSalvatore advised Plaintiff on several occasions to consult with human resources personnel if she felt that she was being bullied and harassed, as well as how to pursue filing a formal complaint.[63]

84.     Based on her interactions with Plaintiff, DeSalvatore found that Plaintiff failed to understand "her role in OIRS as a data analyst and not as a manager of change and improved efficiency."  DeSalvatore opined that Plaintiff "has good data analysis skills," but "lacks the interpersonal skills to work in a busy office with many different personalities, and . . . was not respectful of other peoples' time or of management decisions that she did not agree with."[64]

---

[62]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 81 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 81 [denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact]; *accord,* Dkt. No. 21, Attach. 18, at NYSED000050 [DeSalvatore Aff.].)  *See also, supra*, note 6 of this Decision and Order.

[63]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 79 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 79 [Plf.'s Rule 7.1 Response, purporting to admit an additional fact not asserted by Defendant (i.e., that Plaintiff contacted Earle regarding her "allegations of discrimination") and "otherwise deny[ing]" the fact asserted, but failing to cite record evidence actually supporting denial of above-stated fact].)

[64]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 84 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 84 [Plf.'s Rule 7.1 Response, denying above-stated fact, but failing to cite record evidence actually supporting denial of above-stated fact]; *accord,* Dkt. No. 21, Attach. 18, at NYSED000050 [DeSalvatore Aff.].)

85.     In April 2013, after DeSalvatore became Plaintiff's supervisor, DeSalvatore began the probationary evaluation process.

86.     DeSalvatore advised Martin that Plaintiff needed to be evaluated, and provided Martin with the evaluation form.  DeSalvatore asked Martin to complete the evaluation form because Martin had been Plaintiff's supervisor up until that point.

87.     The form applicable to probationary employees (including Plaintiff) required ratings in seven categories: (A) "Quality of Work"; (B) "Quantity of Work"; (C) "Work Habits"; (D) "Work Interest"; (E) "Relationship with Others"; (F) "Supervisory Skills (if applicable)"; and (G) "Attendance."  The form provided further explanation of each of these categories, and there were four possible ratings for each category: "above average," "average," "below average," or "unsatisfactory."  Space was provided for written comments with respect to each category.  The form also included a section for an ultimate recommendation regarding the employee's services, with four possible choices: "permanently retained," "continued on probation," "continued on probation under the terms of the traineeship," or "terminated."[65]

88.     Martin prepared a draft probationary evaluation report ("draft evaluation") covering the period that she had supervised Plaintiff (apparently either July 19 or August 19, 2012, through April 11, 2013) and shared it with DeSalvatore, Moorhead and Haggerty.  The report was shared with others because it was unusual for a probationary employee to be assigned

---

[65]     (Dkt. No. 21, Attach. 5, at 25 [pagination generated by CM/ECF] [Def.'s Depo. Ex. 14].)

to a new supervisor during the course of the probationary period.[66]

89.     Haggerty reviewed Plaintiff's draft evaluation and expressed concern that Martin's evaluation of Plaintiff's attendance (which Martin rated as "unsatisfactory") was "not fair" because Plaintiff's attendance was actually acceptable.  Ultimately, the final evaluation report rated Plaintiff's attendance as average.[67]

90.     DeSalvatore also provided comments on the draft evaluation.  Specifically, after consulting with human resources staff, DeSalvatore advised that Martin's recommendation to terminate Plaintiff's employment should be changed, and she also provided "feedback on [the] time and attendance rating."[68]

----

[66]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 88 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 88 [Plf.'s Rule 7.1 Response, denying above-stated fact, but failing to cite record evidence actually supporting denial of above-stated fact].)  The Court notes that Defendant asserts that Martin prepared a draft evaluation for the period beginning August 19, 2012; but Martin's e-mail attaching the draft evaluation states that the draft evaluation covers the period "7/19 - 4/11," and the draft evaluation itself reflects that Plaintiff's "Date Appointed" was July 19, 2012.  (Dkt. No. 21, Attach. 9 [Plf.'s Ex. 10].)  This factual assertion is in conflict with Defendant's Fact Number 1, above, which asserts that Plaintiff was appointed on August 9, 2012.

[67]     (Dkt. No. 28, Attach. 2, at 31-32 [Haggerty Depo. Tr.]; Dkt. No. 21, Attach. 18, at NYSED000077 [Haggerty Aff.].)

[68]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 90 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 90 [Plf.'s Rule 7.1 Response, purporting to "Admit" facts not asserted by Defendant and failing to deny above-stated fact]; *accord,* Dkt. No. 21, Attach. 11, at 54 [DeSalvatore Depo. Tr.].)  The Court notes that the copy of the draft evaluation cited by Defendant contains no recommendation as to whether Plaintiff's services should be retained, terminated, or continued on probation (in other words, that question is left blank).  (Dkt. No. 21, Attach. 9, at NYSED000393].)  However, the parties agree (and the record suggests) that Martin initially recommended terminating Plaintiff's employment.  (*See, e.g.,* Dkt. No. 21, Attach. 7, at 35-36, 46 [Martin Depo. Tr.].)

91.     DeSalvatore and human resources staff agreed that the time remaining in Plaintiff's probationary term (i.e., about four months) was sufficient for DeSalvatore to evaluate Plaintiff.

92.     Wagner (who, as Martin's direct supervisor, was responsible for reviewing employee evaluations prepared by Martin) reviewed the draft evaluation as well, and requested that Plaintiff's rating in some of the categories be raised to a higher rating and that the ultimate recommendation be changed. Martin made the changes requested by Wagner.

93.     The final probationary evaluation report recommended that Plaintiff be continued on probation. Although Wagner was in absolutely no way prepared to grant permanent status to Plaintiff, it seemed to him appropriate to "give her more time and to let these issues kind of settle down."[69]

94.     It was the usual practice for a supervisor to discuss a performance evaluation with the subject employee and make recommendations for improvement if performance is less than satisfactory. However, Martin did not follow this practice with respect to Plaintiff because Martin was instructed by Moorhead that she should no longer have any personal interaction with Plaintiff once Plaintiff was assigned to DeSalvatore's supervision.[70]

95.     Plaintiff's probationary term was scheduled to expire on August 8, 2013.

---

[69]     (Dkt. No. 21, Attach. 14, at 105-06 [Wagner Depo. Tr.].)

[70]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 94 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 94 [Plf.'s Rule 7.1 Response, denying above-stated fact in part (i.e., that Martin did not discuss the evaluation based on Moorhead's direction), but failing to provide specific record citation actually supporting partial denial of above-stated fact]; citing, instead, Moorhead's 35-page deposition transcript in its entirety].) Although Defendant asserts that "[i]t was usual practice for a supervisor to *dismiss* a performance evaluation . . ." (Dkt. No. 21, Attach. 2, at ¶ 94 [emphasis added]), Defendant's record citation makes clear that it intended to state "discuss," and Plaintiff's response reflects her understanding of that intention.

<u>May 1, 2013 – Altercation Between Plaintiff and Mitchell</u>

96.     On May 1, 2013, Haggerty advised Martin, via e-mail, that Martin should sign

Plaintiff's probationary evaluation as her supervisor.  Moreover, Haggerty explained that, as

Plaintiff's former supervisor, Martin should evaluate Plaintiff up until the time that Plaintiff was

reassigned, and that DeSalvatore, as Plaintiff's new supervisor, "would take over from that

point."  This was consistent with NYSED's standard practice when an employee was assigned to

a new supervisor.[71]

97.     Plaintiff saw this e-mail when she picked up materials that Mitchell had printed to

a shared printer.  Pursuant to her duties as Martin's assistant, Mitchell printed the e-mail for

Martin, who was not in the office at the time, and planned to put it into a folder with a note for a

response the next morning.[72]

98.     Mitchell asserted in an affidavit that, after she discovered that her printed

documents (including the e-mail at issue) were not at the printer, she (1) went to Plaintiff's

office, (2) stated that she "believed [Plaintiff] may have picked up [Mitchell's] printing," (3)

observed the e-mail sitting on Plaintiff's desk, (4) pointed out the e-mail to Plaintiff, and (5)

---

[71]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 96 [Def.'s Rule 7.1 Statement, asserting
variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt.
No. 29, Attach. 1, at ¶ 96 [denying above-stated fact but failing to cite record evidence actually
supporting denial of above-stated fact].)

[72]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 97 [Def.'s Rule 7.1 Statement, asserting
variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt.
No. 29, Attach. 1, at ¶ 97 [purporting to admit a fact not asserted by Defendant (i.e., the
implication that Mitchell "has access to [Plaintiff's] confidential probationary evaluation and that
Plaintiff discovered this" when she picked up Mitchell's e-mail from the printer), but "otherwise
den[ying]" above-stated fact without citation to record evidence actually supporting denial of
above-stated fact].)

"took it back to" her (Mitchell's) desk.  Moreover, Mitchell asserted that, thereafter, Plaintiff

entered Mitchell's office and "demanded to go through everything" that Mitchell printed.[73]

99.     Plaintiff testified in her deposition that she inadvertently retrieved the e-mail with

other documents from the printer outside of her office and that Mitchell screamed at her and

snatched the documents out of her hands.[74]

100.     Plaintiff reported the incident to DeSalvatore.  DeSalvatore asserted in an

affidavit that she "immediately spoke to [Mitchell] and instructed her to print her documents

using a printer that [Plaintiff] did not use" and "instructed both [Mitchell] and [Plaintiff] that,

should anything similar happen in the future, to not interact and to immediately seek assistance

from a manager."[75]

101.     Plaintiff testified in her deposition that, shortly after the printer incident,

DeSalvatore called her into her office and "blame[d]" her by asking her why she had taken

Mitchell's printed documents and refused to give them to Mitchell.  Moreover, Plaintiff testified

that she "felt" that DeSalvatore treated her differently than Caucasian employees in connection

with this incident.  However, Plaintiff also testified that she did know whether DeSalvatore

spoke with Mitchell about the incident.

---

[73]     (Dkt. No. 21, Attach. 18, at NYSED000074 [Mitchell Aff.].)

[74]     (Dkt. No. 21, Attach. 4, at 112-14 [Plf.'s Depo. Tr.].)

[75]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 100 [Def.'s Rule 7.1 Statement, asserting
variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt.
No. 29, Attach. 1, at ¶ 100 [admitting only that "Plaintiff disclosed the incident to DeSalvatore"
and otherwise denying above-stated fact, but failing to cite record evidence actually supporting
partial denial of above-stated fact].)

102.     On May 3, 2013, Plaintiff sent a lengthy e-mail to Haggerty about the printer incident that had occurred with Mitchell, as well as her related discovery that Martin was preparing Plaintiff's probationary evaluation report.  Plaintiff complained that the conduct of Mitchell and Martin constituted "continued harass[ment] and power-abuse" and that Martin intended to evaluate her as a "means of revenge and deliberate framing up."  Plaintiff's e-mail did not expressly allege that she had been subjected to discrimination.

103.     Haggerty responded to Plaintiff's e-mail on May 29, 2013, and advised Plaintiff that she had spoken with Earle and that they concurred that the incident with Mitchell did not constitute harassment.  Haggerty also stated that nothing had been added to Plaintiff's personnel history file to date, and that Plaintiff could contact her with any questions when she received a formal evaluation.

<u>May-June 2013 – Plaintiff's Complaint Regarding Mitchell's Deletion of Plaintiff's E-Mails</u>

104.     Thereafter, Plaintiff requested and received a meeting with Moorhead, which was scheduled for May 31, 2013.

105.     On that date, Plaintiff sent Moorhead an e-mail "preview[ing]" the issues that she planned to discuss during their upcoming meeting.  Plaintiff wrote that a few things were working better, namely, that she had less contact with Mitchell and Martin, and that DeSalvatore was "more open to ideas regarding" the Dataquest system.

106.     Plaintiff also wrote, however, that there were still "many troubling issues."  More specifically, Plaintiff  cited the fact that Mitchell deleted e-mails from Plaintiff's Dataquest mailbox, DeSalvatore's failure to view this issue as a problem when it was reported to her, and the incident that had occurred with Mitchell's printouts.  Plaintiff further indicated that she felt

that her work environment was "toxic," and that there was insufficient attention given to "abusive behavior and misconduct[] such as bullying, yelling at people, creating troubling problems, power abuses, plotting frame-ups, and lying[.]" Plaintiff did not expressly use the word "discrimination" in her e-mail to Moorhead.[76]

107.    During her meeting with Moorhead, Plaintiff reported that Mitchell was deleting her e-mails from her Dataquest mailbox. Plaintiff testified, however, that the work she had completed remained in her work folder on her computer.

108.    Mitchell's job responsibilities included overseeing the Dataquest mailbox, which is the office's official mailbox. The office receives approximately 50-60 e-mails per day in the Dataquest mailbox.[77]

109.    Mitchell's responsibilities with respect to Dataquest required her to read each e-mail, assign it to the appropriate staff member, and send the staff member an e-mail advising him or her that she had placed an assignment in his or her folder. If a staff member did not respond in a timely manner, Mitchell would send that staff member a reminder e-mail that an assignment was overdue. After a staff member had responded to an assigned item, the e-mail was deleted

---

[76]    (Dkt. No. 21, Attach. 2, at ¶ 106 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above stated-fact]; *with* Dkt. No. 29, Attach. 1, at ¶ 106 [Plf.'s Rule 7.1 Response, "[d]enying [that] Plaintiff did not make an allegation of discrimination" but failing to cite record evidence actually supporting partial denial and "otherwise admit[ting]" fact asserted].)

[77]    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 108 [Def.'s Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 108 [purporting to admit a fact not asserted by Defendant (i.e., the implication that Mitchell's responsibility "was not to access Plaintiff's Dataquest mailbox") but failing to cite record evidence supporting a denial].)

from the staff member's folder and the response was archived.[78]

110.    It was office policy for Mitchell to delete completed Dataquest items from all staff members' Dataquest mailboxes.  However, in response to Plaintiff's concerns, the office policy was reviewed and Mitchell was instructed that she should no longer delete or move anything out of Plaintiff's Dataquest mailbox.  Instead, Plaintiff's co-worker, Jeff Schaffer, was given the responsibility of deleting Plaintiff's e-mails.

111.    In an e-mail dated June 3, 2013, DeSalvatore informed Plaintiff that Mitchell had been notified that she should not delete or move anything out of Plaintiff's Dataquest folder.

112.    Moorhead also advised Plaintiff by e-mail that changes to the Dataquest protocol were implemented to address her concerns about the deletions.  Moorhead indicated that Plaintiff could contact Earle to discuss the possibility of filing an official grievance with respect to the other concerns she expressed in her May 31, 2013, e-mail and during their meeting on the same date.

113.    Plaintiff responded to Moorhead and thanked her for organizing a meeting to review the Dataquest protocol and for attempting "to try to improve the situation and stop the problems."

---

[78]    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 109 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 109 [admitting that Mitchell was generally responsible for "overseeing Dataquest," but asserting that Mitchell's responsibility "was not to access Plaintiff's Dataquest mailbox"]; *accord*, Dkt. No. 21, Attach. 4, at 135 [Plf.'s Depo. Tr., in which Plaintiff stated that Mitchell's duties with respect to Dataquest included Plaintiff's Dataquest mailbox "before the supervisor change," but that, thereafter, Mitchell "was specifically instructed not to touch [Plaintiff's] work and . . . not to access anything"].)

114.     DeSalvatore held a 30-minute "check-in" meeting every other week with all employees who report to her, the purpose of which was to discuss current work assignments, address any deficiencies with employees' work, and allow employees to bring up any issues or highlight any accomplishments.

115.     On June 7, 2013, DeSalvatore had a regularly scheduled check-in meeting with Plaintiff at 1:00 p.m.  During the meeting, Plaintiff informed DeSalvatore that Mitchell was "playing tricks" on her and that coworkers had been "improper" with her in conversation. When DeSalvatore attempted to address Plaintiff's constant "checking" behavior with her colleagues (i.e., repeatedly returning to a colleague's desk to see if they were present and available to talk), Plaintiff became upset and complained about people not respecting her.[79]

116.     DeSalvatore pointed out to Plaintiff that the meeting was 20 minutes over their scheduled time and that Plaintiff was not respecting her time.  Plaintiff became more upset and stated that she was being treated unfairly.  DeSalvatore ended the meeting at that point and advised that she would set up a meeting with Earle for the following week.[80]

---

[79]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 115 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 115 [admitting "only that Plaintiff raised concerns about her working environment to DeSalvatore during the scheduled check-in meetings" and otherwise denying above-stated fact, but failing to cite record evidence actually supporting partial denial of above-stated fact].)

[80]     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 116 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 116 [denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)  According to DeSalvatore, at the check-in meeting on June 7, 2013, Plaintiff "mentioned sexual harassment" but, when DeSalvatore "told her point blank that she was in no way encountering any sexual harassment here," Plaintiff "agreed."

117.    On June 7, 2013, Plaintiff sent a lengthy e-mail to Earle, complaining about "abusive" incidents.  Plaintiff asserted that Mitchell and Martin continued to "play tricks" and "plot destroying" her, and that DeSalvatore defended their misconduct.

118.    In her June 7, 2013, e-mail, Plaintiff did not make an allegation of racial, national origin, or gender discrimination, but rather stated, "I'm not bringing these issues to you as illegal issues at this stage.  I'm bringing them to you as workplace abusive issues, toxic workplace environment issues as a Healthy Workplace Bill [*sic*]."[81]

119.    DeSalvatore and Earle met with Plaintiff on June 11, 2013.  During the meeting, they discussed the issues raised in the June 7, 2013, check-in meeting, Plaintiff acknowledged that she had some deficiencies with interpersonal relationships and she agreed to improve, and a plan was made for moving forward.[82]

_____

(Dkt. No. 21, Attach. 18, at NYSED000050 [DeSalvatore Aff.]; *accord,* Dkt. No. 21, Attach. 11, at 102 [DeSalvatore Depo. Tr.].)  Because Plaintiff made reference to "sexual harassment," however, DeSalvatore "immediately" scheduled a meeting with Plaintiff and Earle.  (Dkt. No. 21, Attach. 11, at 101-03 [DeSalvatore Depo. Tr.].)  Although it is unclear to what Plaintiff was referring which she mentioned "sexual harassment" to DeSalvatore, Plaintiff testified in her deposition that she is not asserting a claim of sexual harassment in this action.  (Dkt. No. 21, Attach. 4, at 202 [Plf.'s Depo. Tr.].)

[81]    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 118 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 118 [purporting to "[a]dmit" an additional fact not asserted by Defendant (i.e., that Plaintiff "specifically complained verbally about discrimination") and otherwise denying fact asserted, but failing to cite record evidence actually supporting denial of above-stated fact].)  Plaintiff was apparently referencing a proposed bill that would create a state law civil cause of action for employees who were subjected to an "abusive work environment."  N.Y. Assembly Bill No. A3250 (Jan. 22, 2015).

[82]    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 119 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 119 [purporting to "[a]dmit" an additional fact not asserted by Defendant (i.e., that DeSalvatore, Earle, and Plaintiff met to discuss "allegations of 'sexual harassment'") and otherwise denying fact asserted, but failing to cite record evidence actually supporting denial of above-stated fact].)

## Plaintiff's Receipt of Her Evaluation and Altercation with Wagner

120. On June 21, 2013, Plaintiff's probationary performance evaluation was finalized and signed by Martin as Plaintiff's former supervisor and by Wagner as "reviewer."

121. Wagner's assistant, Carol Donnelly ("Donnelly"), provided the performance evaluation to Plaintiff on the same date. Donnelly asked Plaintiff if she would like an appointment with Wagner to discuss the evaluation. Plaintiff requested an appointment, and one was scheduled for Monday, June 24, 2013.

122. The signed probationary evaluation report ("final evaluation") provided to Plaintiff on June 21, 2013, contained ratings in each of the evaluation categories noted above, accompanied by comments. Plaintiff received an "average" rating in both the "Quality of Work" and "Attendance" categories. Plaintiff received a "below average" rating in the "Quantity of Work" category, with two comments: (1) "Employee has refused Supervisor's request to produce dated responses to work that has remained unanswered in employee's Dataquest inbox"; and (2) "NAEP statewide demographic data project was not completed in a timely manner and was re-assigned to another staff member." Plaintiff received a "below average" rating in the "Work Habits" category, with the following comments: "NYS Statistical Yearbook: employee presumed that since initial project deadline had passed that work was not required to be completed. Employee did not contact supervisor to confirm but made unilateral decision not to do the work. Supervisor became aware that work was not being completed as assigned when the Yearbook publisher indicated that none of the work had been received. Tasks of other staff had to be realigned in order to complete this unfinished project." Plaintiff received a "below average" rating in the "Work Interest" category, with the following comment: "Employee complained that

she believed that she had been singled out as the only staff member to be assigned work through Dataquest."  Plaintiff received an "unsatisfactory" rating in the "Relationship with Others" category, with the following comments:  "The employee has insulted a co-worker by making demeaning comments about the employee's intelligence.  On a different occasion, the employee has insulted the supervisor.  Both of these situations have taken place in the office within view and hearing of co-workers.  The employee had to be assigned to another supervisor."  The report ultimately recommended that Plaintiff's employment be "continued on probation" (i.e., not permanently retained, but also not terminated).[83]

123.    Plaintiff visited Wagner's office suite several times at the end of the day on June 21, 2013, with the intention of speaking to Wagner about the final evaluation.  Wagner's assistant, MaryAnn VanBlarcom ("VanBlarcom"), informed Plaintiff that he was in a meeting.[84]

124.    Wagner's office was located in a separate suite on the same floor as the suite in which Plaintiff's office was located.

125.    Wagner returned to his office from his meeting at around 6:00 p.m.  VanBlarcom explained that Plaintiff had stopped by several times.  VanBlarcom then left for the evening, and Wagner closed the external door to the office suite and began working at his desk in his internal office.[85]

---

[83]    (Dkt. No. 21, Attach. 5, at 25 [pagination generated by CM/ECF] [Def.'s Depo. Ex. 14].)

[84]    (Dkt. No. 21, Attach. 18, at NYSED000059 [Wagner Aff.]; Dkt. No. 21, Attach. 14, at 111-12 [Wagner Depo. Tr.]; Dkt. No. 21, Attach. 4, at 180-82 [Plf.'s Depo. Tr.].)

[85]    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 125 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 125 [denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

126.     At about 7:00 p.m., Plaintiff returned to Wagner's office and the two exchanged words. The parties dispute the nature of the exchange. Wagner testified in his deposition that, while he was working that evening, Plaintiff loudly "burst into [his] office and demanded to talk in a very kind of agitated and intimidating way"; in a "conversational voice," Wagner asked Plaintiff to leave and told her that they would speak at their scheduled meeting the following week; when Plaintiff continued to block his office doorway and demand to speak to him, Wagner repeated himself "in a very loud and firm voice that she needed to leave."[86] However, Plaintiff testified in her deposition that she returned to Wagner's office suite and "gently" knocked on his door, and Wagner "[i]nstantly . . . bl[e]w up," repeatedly "scream[ing] at [her]" to leave his office.[87]

127.     Wagner testified in his deposition that Plaintiff refused to leave and remained positioned near the door, demanding to discuss her final evaluation immediately, while Wagner remained in the chair at his desk.[88] However, Plaintiff testified in her deposition that Wagner continuously "yell[ed] and scream[ed] at her, that she was "shocked," and that she could "hardly get a word [out]," until she turned to leave and stated that she would retain a lawyer to attend the meeting with her the following week.[89]

128.     Wagner testified in his deposition that he felt threatened by Plaintiff's behavior and called out to Amrit Singh ("Singh"), who was working in another office within the same

---

[86]     (Dkt. No. 21, Attach. 14, at 111-16 [Wagner Depo. Tr.].)

[87]     (Dkt. No. 21, Attach. 4, at 184-85 [Plf.'s Depo. Tr.].)

[88]     (Dkt. No. 21, Attach. 14, at 116 [Wagner Depo. Tr.].)

[89]     (Dkt. No. 21, Attach. 4, at 187 [Plf.'s Depo. Tr.].)

suite; Singh came to Dr. Wagner's office and remained there until Plaintiff eventually left.[90]

However, Plaintiff testified that she was "completely scared" by Wagner, who kept yelling at her

and "didn't give [her] . . . a chance to respond" until, finally, she "left immediately."[91]

129.    At some point during the altercation, Wagner told Plaintiff that her behavior was

consistent with some of the areas of concern noted in her final evaluation, based on behavior that

she had reportedly demonstrated with other people in the office.[92]

130.    Shortly after Plaintiff left Wagner's office, Wagner e-mailed and called NYSED's

Director of Human Resources, Annette Franchini, to report his version of the incident.[93]

131.    After the incident on the evening of June 21, 2013, Plaintiff's probationary

employment with NYSED was terminated.

132.    Plaintiff called in sick on June 24, 2013, and indicated that she would be out for

an extended period of time.  Plaintiff thereafter provided a note from her doctor, and was granted

sick leave up until the date of her termination.

---

[90]      (Dkt. No. 21, Attach. 14, at 118 [Wagner Depo. Tr.].)

[91]      (Dkt. No. 21, Attach. 4, at 188 [Plf.'s Depo. Tr.].)

[92]      (*Compare* Dkt. No. 21, Attach. 2, at ¶ 129 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 129 [Plf.'s Rule 7.1 Response, purporting to "[a]dmit only that Wagner alleged Plaintiff was acting in a manner consistent with the allegations in the probationary report" and "otherwise deny[ing]" fact asserted, but failing to cite record evidence actually supporting denial of above-stated fact].)

[93]      (*Compare* Dkt. No. 21, Attach. 2, at ¶ 130 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 130 [denying above-stated fact to the extent that Defendant asserts that Wagner e-mailed Franchini "immediately" after Plaintiff left his office, but failing to cite record evidence actually supporting denial of above-stated fact, given that the e-mail was sent at 7:11 p.m.].)

133. Plaintiff was informed by letter dated June 28, 2013, that her probationary employment with NYSED would be terminated effective July 12, 2013. The reason for Plaintiff's termination, as set forth in the letter, was her "inappropriate, intimidating and insubordinate behavior on June 21, 2013[,] in an interaction with a manager in the Office of P-12 Education." More particularly, the letter explained that Plaintiff "barged into the manager's office in a loud and aggressive manner and[,] despite repeated directives to leave, refused to do so."[94]

134. Wagner testified in his deposition that, to his knowledge and based on his understanding of Plaintiff's e-mails and other communications, Plaintiff felt that her co-workers "hated her" and were "mistreating her," but "she never mentioned that she felt [that] she was [subjected to] discriminat[ion]" based on her race or national origin.[95]

135. During her employment with NYSED, Plaintiff never filed a formal complaint or grievance.[96]

---

[94] (Dkt. No. 21, Attach. 5, at 30 [pagination generated by CM/ECF] [Def.'s Depo. Ex. 17].)

[95] (Dkt. No. 21, Attach. 14, at 138-140 [Wagner Depo. Tr.].)

[96] (*Compare* Dkt. No. 21, Attach. 2, at ¶ 135 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 135 [Plf.'s Rule 7.1 Response, admitting that Plaintiff "never filed a 'formal' complaint or grievance, and purporting to deny a fact not expressly asserted by Defendant (i.e., that "such a process was available for allegations of discrimination based on national origin . . .")].) The Court notes that, to the extent that Plaintiff asserts that Defendant's employee handbook does not *specifically* state that an employee may file a complaint or grievance regarding national origin discrimination, she appears to be correct. (Dkt. No. 21, Attach. 19, at NYSED128-30.) However, the employee handbook states that it is New York State policy to "provide for and promote equal opportunity employment, compensation, and other terms and conditions of employment without discrimination on the basis of age, race, color, religion, disability, *national origin* . . ." (*Id.* at NYSED128 [emphasis added].) A separate section of the employee handbook, titled "Complaints and Grievances," discusses employees'

Post-Termination Administrative Proceedings

136.     On September 13, 2013, Plaintiff filed a complaint with the New York State

Division of Human Rights ("NYSDHR"), alleging that (1) she had been discriminated against

because of her national origin, gender, and disability, and (2) that she had been subjected to

retaliation for opposing the discrimination.

137.     On February 19, 2014, Plaintiff filed an amended complaint with the NYSDHR,

adding a claim that she had been subjected to racial discrimination.

138.     NYSED opposed Plaintiff's complaint and amended complaint.

139.     On March 12, 2014, the NYSDHR issued a determination dismissing Plaintiff's

complaint.[97]  The NYSDHR found that there was "insufficient evidence to support [Plaintiff's]

claims of unlawful discriminatory actions due to her race, national origin, sex, temporary

disability, or in retaliation for opposing discrimination."

140.     On April 24, 2014, the Equal Employment Opportunity Commission ("EEOC")

adopted the findings of the NYSDHR and issued Plaintiff a right-to-sue letter.

December 2014 – Plaintiff's Receipt of a Job Offer

141.     In December 2014, Plaintiff received a job offer for a Program Research

Specialist 2 position with the New York State Office of Primary Care and Health Systems

---

right to file a complaint and/or grievance about "working conditions, perceived out-of-title duties
or other things related to your job" that cannot be resolved by a discussion with the employee's
manager or supervisor.  (*Id.* at NYSED000131.)

[97]     Although the NYSDHR's determination states that Plaintiff's "complaint" was
ordered dismissed, the determination's discussion reflects that the NYSDHR also considered, and
rejected, the claim in her amended complaint (i.e., racial discrimination).  (*See* Dkt. No. 21,
Attach. 18, at NYSED000109 [noting that Plaintiff's complaint "was amended to include race as
a basis [of discrimination] and allegations of disparate pay"].)

Management Center for Health Care Facility Licensure, Planning and Finance. This position was for the same job title, and at the same salary grade, as Plaintiff's previous job with NYSED, and involved very similar responsibilities related to the collection and analysis of data.

142. On December 4, 2014, Plaintiff declined the job offer because she was "looking for a higher grade level position at this point in [her] career."

The Court notes that Plaintiff's Rule 7.1 Response also includes numerous separately numbered material facts that Plaintiff asserts are genuinely in dispute. (Dkt. No. 29, Attach. 1, at 1-8.) Some of the record evidence cited in support of Plaintiff's factual assertions also appear in Plaintiff's responses to Defendant's Rule 7.1 Statement, as set forth above. Familiarity with these purportedly disputed material facts is assumed in this Decision and Order, which is intended primarily for the review of the parties.

### C. Summary of Parties' Arguments

#### 1. Defendant's Memorandum of Law

Generally, in its memorandum of law, Defendant advances four arguments. (Dkt. No. 21, Attach. 1 [Def.'s Memo. of Law].)

First, Defendant argues that Plaintiff's Title VII discrimination claim must be dismissed for the following reasons: (a) because her probationary evaluation report, denial of her requests to be transferred, and the fact that she was allegedly yelled at and blamed for mistakes that she did not commit do not constitute adverse employment actions, the only adverse employment action that she experienced was her termination in July 2013 (*id.* at 17-18); (b) she has not identified circumstances giving rise to an inference of discrimination because (i) there is no direct evidence that any employee of Defendant discriminated against her based on her race,

national origin, or gender, (ii) she has not shown that she was treated differently than any similarly situated employees outside of her protected class, and (iii) the record evidence reflects that, when she complained of confrontations with her coworkers, her superiors listened to her concerns, addressed those confrontations by stating their expectations to everyone involved in the confrontations, and transferred Plaintiff to a new supervisor (i.e., from Martin to DeSalvatore) (*id.* at 18-21); (c) the NYSDHR's decision dismissing her administrative complaint is persuasive evidence that she was not subjected to discrimination; and (d) Defendant has demonstrated that she was terminated for legitimate, nondiscriminatory reasons (particularly, her insubordinate conduct on June 21, 2013, when she accosted Wagner in his office after working hours and repeatedly demanded to discuss her evaluation), and Plaintiff has failed to rebut this showing (*id.* at 22-23).

Second, Defendant argues that Plaintiff's Title VII hostile work environment claim must be dismissed for the following reasons: (a) the alleged incidents of hostility that form the basis of Plaintiff's claim (i) were not sufficiently severe to support such a claim, (ii) were not sufficiently pervasive to support such a claim, and (iii) constituted sparse, innocuous personality conflicts that were unrelated to her membership in any protected class (*id.* at 24-25); and (b) the alleged incidents cannot be imputed to Defendant because the record reflects that management (i) adequately addressed her complaints, based on the available information, by transferring her to another supervisor when she complained about Martin and Mitchell in early April 2013 and changing office procedures for deleting old e-mails when she complained about Mitchell allegedly destroying her work, and (ii) repeatedly advised her that she could file a formal complaint or grievance pursuant to NYSED policies, but she failed to do so (*id.* at 25-26).

Third, Defendant argues that Plaintiff's Title VII retaliation claim must be dismissed for the following reasons: (a) the record evidence demonstrates that she has not engaged in any protected activity of which Defendant was made aware because (i) she did not file a formal complaint or grievance at any point during her employment, (ii) her informal complaints to management and human resources personnel were generalized complaints of harassment and unfair treatment, but did not allege that this treatment was based on her race, national origin, or gender, and (iii) in one such informal complaint, directed to Earle, she expressly disclaimed that she was asserting any illegal conduct (*id.* at 27-29); (b) under the circumstances, her performance evaluation (which was "mixed," rather than "negative," and extended her probationary employment) did not constitute an adverse employment action for purposes of her retaliation claim (*id.* at 29-30); (c) the other alleged incidents, including the denial of her request for a transfer to another office and the occasions on which coworkers "yelled at her," constituted mere "trivial" harms rather than adverse employment actions (*id.* at 30); (d) the record evidence does not support the conclusion that a causal connection existed between her first complaint on April 4, 2013, and the issuance of her final evaluation because (i) these two events occurred more than two-and-a-half months apart and (ii) in the interim, other attenuating events related to her complaints occurred, including her transfer to a new supervisor, changing the protocol for the deletion of Dataquest e-mails, significant time spent listening to and discussing her concerns, and elevating the ratings given to her on her probationary evaluation report to allow her to continue her employment (*id.* at 31-32); and (e) as argued with respect to her discrimination claim, Defendant has demonstrated that she was terminated for legitimate, nondiscriminatory reasons (*id.* at 32-34).

Fourth, and finally, Defendant argues that, to the extent that the Court denies its motion for summary judgment on the merits, the Court should hold that Plaintiff failed to mitigate her damages and, as a result, any recovery must be limited to the time period from July 12, 2013 (the date of her termination) until December 4, 2014 (the date on which she rejected an offer of comparable employment because she was seeking a "higher grade level position"). (*Id.* at 33-34.)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in her opposition memorandum of law, Plaintiff advances four arguments. (Dkt. No. 29 [Plf.'s Opp'n Memo. of Law].)

First, Plaintiff "withdraws" her claim that Defendant subjected her to a hostile work environment. (*Id.* at 3.)

Second, Plaintiff argues that her Title VII retaliation claim should not be dismissed for the following reasons: (a) she engaged in protected activity by (i) discussing her complaints of discrimination and retaliation with Earle and Moorhead in April 2013, and requesting that Moorhead transfer her to another office, (ii) discussing, with Haggerty, her belief that she was being treated differently than her Caucasian colleagues and subjected to a negative evaluation in retaliation for her complaints against Martin, to Haggerty, (iii) discussing her concerns "directly and indirectly" with Wagner, (iv) discussing, with DeSalvatore, her concerns about a sexual harassment incident and the fact that DeSalvatore was imposing "rules" upon her that did not apply to "Caucasian employees," and (v) discussing her concerns about Mitchell's discriminatory behavior toward her with Martin (*id.* at 11-16); (b) Defendant's submissions to the NYSDHR (in response to Plaintiff's administrative complaint of discrimination) reflect that management

understood Plaintiff's complaints to regard discrimination based on her national origin (*id.* at 13); (c) she was subjected to adverse employment actions when (i) she received her final evaluation and her term of probationary employment was extended (rather than being offered permanent employment) and (ii) she was terminated (*id.* at 16-17); and (d) an inference of retaliatory intent may reasonably be drawn from the record evidence based upon "the timing of conflicts involving her [c]omplaints of discrimination" (*id.* at 17-18).

Third, Plaintiff argues that her Title VII discrimination claim should not be dismissed for the following reasons: (a) it is undisputed that (i) she is a member of a protected class and (ii) her termination constituted an adverse employment action (*id.* at 20); (b) the circumstances of her termination (specifically, that it followed her numerous informal complaints to multiple members of management and human resources personnel) give rise to an inference of discriminatory animus on the part of decision-makers (*id.* at 20-21); and (c) Defendant's argument that it had legitimate, nondiscriminatory reasons for terminating her employment (i.e., the fact that she was insubordinate and Wagner felt intimidated by her behavior) could reasonably be disbelieved by a jury and, in any event, she carried her burden in opposing Defendant's argument by relying on the evidence establishing her claim of discrimination (*id.* at 21-23).

Fourth, and finally, Plaintiff argues that the issue of whether she failed to properly mitigate her damages cannot be appropriately resolved on Defendant's motion for summary judgment and, in any event, the record evidence reflects that she was unable to accept the offer of comparable employment because it was available for only 40 minutes. (*Id.* at 23-24.)

### 3.     Defendant's Reply Memorandum of Law

Generally, in its reply, Defendant reiterates the arguments set forth in its memorandum of law and, moreover, argues as follows: (1) to the extent that Plaintiff has denied the facts set forth in Defendant's statement of material facts without a supporting citation to the record, the Court should deem those facts admitted (Dkt. No. 30 at 1-2 [Def.'s Reply Memo. of Law]);[98] (2) in arguing that her discrimination claim should not be dismissed because decision-makers at NYSED had "knowledge" of her "allegations of discrimination," Plaintiff conflates the elements that comprise a discrimination claim with the elements that comprise a retaliation claim (*id.* at 3); (3) with respect to Plaintiff's discrimination claim, she has failed (and has not even attempted) to identify any similarly situated comparators that were treated more favorably than she was (*id.* at 3-4); (4) with respect to Plaintiff's retaliation claim, the record evidence establishes that she did not complain about discrimination while employed by NYSED, but rather complained generally about "harassment" and "bullying" (*id.* at 6-7); (5) Plaintiff's final evaluation report did not materially affect the terms and conditions of her employment and this is not a "tenure denial" case (*id.* at 7-8); and (6) Plaintiff has cited no record evidence supporting her arguments that (a) her protected activity was a "but-for" cause for her termination and (b) her termination was pretextual, and temporal proximity between the protected activity and adverse employment action, by itself, is insufficient to establish pretext (*id.* at 8-9).

---

[98]     Specifically, Defendant argues that Plaintiff has denied (in whole or in part) the following numbered material facts set forth in its statement of material facts, without citation to supporting record evidence: 10-23, 26, 28-29, 32, 34-38, 51, 63, 69, 72-74, 76, 80-81, 84, 95-96, and 100.  (Dkt. No. 30 at 2 n.1.)

## II.     RELEVANT LEGAL STANDARDS

### A.     Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[99]  As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to

---

[99]     As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

perform an independent review of the record to find proof of a factual dispute.[100]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[101]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[102] Stated another way, when a non-movant fails to oppose a legal argument

---

[100]    *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[101]    Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[102]    *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to

asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### B. Legal Standard Governing Plaintiff's Claims

Because the parties have (in their memoranda of law) demonstrated an adequate familiarity with the legal standards governing Plaintiff's claims, the Court will not recite in detail those legal standards in this Decision and Order, which is intended primarily for the review of the parties. Rather, the Court will discuss those legal standards only where necessary below, in Part III of this Decision and Order.

## III. ANALYSIS

### A. Whether Plaintiff's Title VII Discrimination Claim Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth in Defendant's memoranda of law. (Dkt. No. 21, Attach. 1, at 16-23 [Def.'s Memo. of Law]; Dkt. No. 30 at 2-6 [Def.'s Reply Memo. of Law].) To those reasons, the

---

oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

Court adds the following analysis, which is intended to supplement, and not to supplant, those reasons.

As an initial matter, Defendant does not dispute that Plaintiff has established her membership in a protected class based on her gender, race, and national origin. Moreover, as Plaintiff correctly notes, Defendant also does not dispute that Plaintiff's termination constituted an adverse employment action for purposes of her discrimination claim. (Dkt. No. 29 at 20 [Plf.'s Opp'n Memo. of Law].) *See also Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) ("Employment actions that [the Second Circuit] ha[s] deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.") (internal quotation marks omitted). Based upon a review of the record, the Court concludes that admissible record evidence exists establishing each of these two elements of Plaintiff's discrimination claim.[103]

The Court must next consider whether Plaintiff has adduced evidence from which a jury could reasonably draw an inference of discriminatory animus. "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the

---

[103]    With respect to her Title VII *retaliation* claim, Plaintiff argues that the extension of her probationary period of employment (as opposed to permanent retention) also constituted an adverse employment action. (Dkt. No. 29 at 17 [Plf.'s Opp'n Memo. of Law].) However, the only adverse employment action that she identifies with respect to her Title VII *discrimination* claim is the termination of her employment. (*Id.* at 20.)

protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 [2d Cir. 2009]).

Liberally construing Plaintiff's Rule 7.1 Response and opposition memorandum of law (as well as her Complaint and deposition testimony), Plaintiff has identified the following incidents that, in her view, give rise to an inference of discrimination on the basis of her race, gender, and/or national origin: (1) she was the only employee to be assigned work assignments through Dataquest;[104] (2) in February 2013, Holliday, a clerk, "yelled" at her, and asked if she was "digging [for] information," when she asked if Holliday knew whether she could take vacation time before she had accrued it;[105] (3) in March 2013, she asked Mitchell clarifying questions about an assignment and Mitchell shouted at her and asked her, "Why [do] you ask me?";[106] (4) in April 2013, Mitchell sent her an e-mail stating that she did not want Plaintiff to suggest to anyone else that Mitchell agreed with any of Plaintiff's ideas for improving the office's productivity or changing how the work was handled;[107] (5) in April 2013, Mitchell screamed at her, wrongly accused her of giving incorrect information to a customer, and demanded that she leave Mitchell's office;[108] (6) Martin treated her unfairly–and "differently than the Caucasian

---

[104]     Fact No. 18 in Part I.B. of this Decision and Order.

[105]     Fact No. 27 in Part I.B. of this Decision and Order.  (*See also* Dkt. No. 21, Attach. 4, at 48 [Plf.'s Depo. Tr.].)

[106]     Fact No. 28 in Part I.B. of this Decision and Order.

[107]     Fact Nos. 29-31 in Part I.B. of this Decision and Order.  (*See also* Dkt. No. 21, Attach. 4, at 67-68 [Plf.'s Depo. Tr.].)

[108]     Fact No. 33 in Part I.B. of this Decision and Order.  (*See also* Dkt. No. 21, Attach. 4, at 63-65 [Plf.'s Depo. Tr.].)

employees"–with respect to the incident in which Mitchell accused her of sending incorrect information to a customer by believing Mitchell's account of the incident, although Plaintiff admittedly did not know what Martin discussed with Mitchell with respect to the incident[109]; (7) from April 2 to 4, 2013, Martin repeatedly told her that Plaintiff gave incorrect information to a customer and demanded that Plaintiff send the customer data, despite the fact that Plaintiff had answered the customer's inquiry and the customer did not actually request data;[110] (8) between February 2013 and April 2013, she felt that, "because [she was] a Chinese," she was "yelled at" for "ask[ing] a simple question" and "ignore[d]" by other employees who came to her office to speak with her officemate;[111] (9) Plaintiff was directed to contact a supervisor by e-mail only;[112] (10) on May 1, 2013, when Mitchell discovered that Plaintiff had inadvertently retrieved an e-mail printed by Mitchell to a shared printer, she screamed at Plaintiff and snatched the document out of her hands;[113] (11) in relation to the same printer incident, DeSalvatore "blame[d]" Plaintiff for the altercation with Mitchell by asking Plaintiff why she had taken the printed document and refused to give it to Mitchell, and thereby (she "felt") treated her differently than Caucasian employees;[114] (12) Martin elected to complete a performance evaluation of Plaintiff nine months

---

[109]    Fact No. 40 in Part I.B. of this Decision and Order.  (*See also* Dkt. No. 21, Attach. 4, at 75 [Plf.'s Depo. Tr.].)

[110]    Fact No. 41 in Part I.B. of this Decision and Order.

[111]    Fact No. 42 in Part I.B. of this Decision and Order.

[112]    (Dkt. No. 1 at ¶¶ 71-72 [Plf.'s Verified Compl.].)

[113]    Fact No. 99 in Part I.B. of this Decision and Order.

[114]    Fact No. 101 in Part I.B. of this Decision and Order.  (*See also* Dkt. No. 21, Attach. 4, at 111-15 [Plf.'s Depo. Tr.].)

after Plaintiff's starting date merely as a "means of revenge and deliberate framing up [*sic*]";[115]

(13) Mitchell deleted Plaintiff's e-mails from the Dataquest mailbox in an effort to undermine her and/or destroy her work;[116] (14) after DeSalvatore became her supervisor, Plaintiff reported to DeSalvatore that Mitchell continued "playing [unspecified] tricks" on Plaintiff, and other unidentified coworkers had been "improper" with her in conversation;[117] and (15) on June 21, 2013, when she attempted to discuss her final evaluation, Wagner "bl[e]w up" and repeatedly "scream[ed] at [her]" to leave his office.[118]

Even fully crediting Plaintiff's account of each of these incidents (many of which Defendant disputes with supporting citations to record evidence), the Court concludes that Plaintiff has failed to identify circumstances justifying an inference that those incidents were actually related to Plaintiff's protected characteristics. The Court reaches this conclusion for four reasons. First, Plaintiff has identified no record evidence (and the Court has come across no evidence) that any employee of Defendant criticized Plaintiff, or her performance, in degrading terms related to her race, national origin, or gender. *See, e.g.*, *Chan v. NYU Downtown Hosp.*, 03-CV-3003, 2006 WL 345853, at *5 (S.D.N.Y. Feb. 14, 2006) ("Plaintiff does not point to a single degrading remark made during her employment based on gender, race, or national origin.").

---

[115]     (Dkt. No. 21, Attach. 5, at 17 [pagination generated by CM/ECF] [Def.'s Depo. Ex. 10].)

[116]     Fact Nos. 106-07 in Part I.B. of this Decision and Order.

[117]     Fact No. 115 in Part I.B. of this Decision and Order. (*See also* Dkt. No. 21, Attach. 11, at 139-140 [DeSalvatore Depo. Tr.].)

[118]     Fact Nos. 126-28 in Part I.B. of this Decision and Order.

Second, Plaintiff has identified no record evidence (and, again, the Court has come across no evidence) that any employee of Defendant made invidious comments about Plaintiff or anyone else in Plaintiff's protected groups. The Court notes that, even if Plaintiff's assertions that Holliday, Mitchell, Martin, DeSalvatore, and/or Wagner unfairly yelled at her or blamed her for work-related mistakes that she did not commit are credited as true, no juror could reasonably infer that the abuse that Plaintiff suffered was the result of discriminatory animus. *See, e.g., Daniel v. T & M Protection Resources, LLC,* 87 F. Supp. 3d 621, 635 (S.D.N.Y. 2015) (concluding that while certain "statements . . . may well be viewed as obnoxious . . . they have no apparent link to Daniel's membership in a protected class[, and] Daniel has not provided any evidence to support an inference that these statements were made because of his race, national origin, or sex, or that employees with different demographic characteristics were not subjected to similarly obnoxious treatment"); *Gibbs v. New York State Dep't of Taxation and Fin.*, 04-CV-0905, 2009 WL 754307, at *7 (E.D.N.Y. Mar. 20, 2009) (granting defendant's motion for summary judgment where plaintiff "has alleged no such [invidious] comments [and, c]onsequently, there is no evidence whatsoever to suggest that [he] was suspended from work on account of his race").

Third, the Court finds that the sequence of events that culminated in Plaintiff's discharge also does not provide a basis from which a discriminatory motive may be reasonably inferred. Indeed, despite performance issues on certain work-related projects (the factual accuracy of which Plaintiff failed to properly controvert in opposition to Defendant's motion), Plaintiff's final evaluation provided that her probationary term was going to be extended: that is, until her altercation with Wagner hours after she received the final evaluation. This undisputed fact

undermines any inference, based on the timing of these events, that Plaintiff was terminated due to her membership in a protected class.

Fourth, although Plaintiff's discrimination claim is cast as one arising from disparate treatment (*see, e.g.*, Dkt. No. 1 at ¶¶ 73, 75, 94, 99 [Plf.'s Verified Compl.]; Dkt. No. 29 at 4 [Plf.'s Opp'n Memo. of Law, noting that Plaintiff "disclosed to" Haggerty that she was being "harassed and treated in a disparate manner than [*sic*] her Caucasian colleagues"], 18-19 [setting forth the framework for "disparate treatment claims"]), Plaintiff has not identified any similarly situated employees outside of her protected groups who were treated differently. "A plaintiff relying on disparate treatment evidence 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 [2d Cir. 2000]); *accord, Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir. 1997). Here, Plaintiff, has not even attempted to identify any similarly situated coworkers, probationary status or otherwise, much less established that any such coworker was subject to the same workplace standards, performed similar job functions, engaged in comparably serious conduct, or shared any other "objectively identifiable basis for comparability." *Graham*, 23 F.3d at 40 (internal quotation marks omitted); *accord, e.g., Hongyan Lu v. Chase Inv. Servs. Corp.*, 412 F. App'x 413, 417-18 (2d Cir. 2011) (summary order) (noting that plaintiff "offer[ed] 'little more than conclusory statements' and 'sweeping allegations unsupported by admissible evidence'" that similarly situated male coworkers were treated differently). As a result, Plaintiff's repeated assertions in her deposition that she perceived that she was treated differently than Caucasian employees are conclusory and speculative. (Dkt. No. 21, Attach. 4, at 45, 47, 57, 74, 82, 84-85,

89-90, 108, 115-16 [Plf.'s Depo. Tr.].) *See also Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 456 (2d Cir. 1999) (noting that Plaintiff's reliance on her own deposition testimony, "in which she stated that she had experienced feelings of isolation, hostility, and disinterest in her work in Africana Studies," was unpersuasive because "feelings and perceptions of being discriminated against are not evidence of discrimination") (brackets and internal quotation marks omitted).

In sum, while Plaintiff has recited numerous events that, if fully credited, certainly suggest that her coworkers and supervisors were sometimes brusque, rude, and unfriendly, the Court concludes that she has failed to establish the existence of circumstances from which a reasonable juror could infer that these occasional actions were related to her protected status. Accordingly, for the reasons enumerated above (in addition to those set forth in Defendant's memoranda of law), Plaintiff's Title VII discrimination claim is dismissed.

B.      **Whether Plaintiff's Title VII Retaliation Claim Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative substantially for the reasons set forth in Defendant's memoranda of law. (Dkt. No. 21, Attach. 1, at 26-36 [Def.'s Memo. of Law]; Dkt. No. 30 at 6-9 [Def.'s Reply Memo. of Law].) To those reasons, the Court adds the following three points.

First, the Court finds it difficult to reasonably conclude that Plaintiff engaged in a protected activity of which Defendant was aware. Defendant correctly notes that, during her employment, Plaintiff never filed a formal complaint or grievance with NYSED regarding any discrimination to which she had allegedly been subjected. Moreover, as detailed above, Plaintiff sent numerous e-mails to Haggerty, Martin, Earle, and Wagner, informally complaining of her frustrations with her coworkers. However, the lack of any explicit reference in these e-mails to

activities prohibited by Title VII (for example, by use of phrases such as "race," "national origin," "gender," "discrimination," or "retaliation") is so conspicuous as to appear intentional. (*See, e.g.,* Dkt. No. 21, Attach. 5, at 16-17 [Def.'s Depo. Ex. 10, Plf.'s e-mail to Haggerty related to the printer incident, dated 5/3/2013, in which Plaintiff stated that Martin continued "using her power in an abusing way," and to try to seek "revenge" against, and "frame," Plaintiff, and Mitchell committed acts of "abuse, bullying, and harassing behavior"]; *id.* at 9 [Def.'s Depo. Ex. 6, Plf.'s letter to Earle, dated 4/8/2013, in which Plaintiff explained that she was writing "about some office harassment and power abuses behavior [*sic*]" and the "extreme[ly] heinous behavior" exhibited by Mitchell and Martin on April 4, 2016]; *id.* at 11 [Def.'s Depo. Ex. 8, Plf.'s e-mail to Moorhead, dated 4/11/2013, in which Plaintiff requested a transfer to another office based on the "harassing language, bullying, and power-abuse [*sic*]" purportedly exhibited by Martin and Mitchell]; *id.* at 18 [Def.'s Depo. Ex. 11, Plf.'s e-mail to Moorhead, dated 5/31/2013, in which Plaintiff noted that the work environment was "toxic" and that insufficient attention was being given to "bullying, yelling at people, . . . power abuses, plotting frame-ups, and lying"].)  Indeed, in her e-mail to Earle on June 7, 2013, Plaintiff explicitly stated that she was "not bringing these issues to you a[s] illegal issues at this stage."  (*Id.* at 21 [Def.'s Depo. Ex. 13, e-mail from Plaintiff to Earle, dated 6/7/2013].)  Rather, Plaintiff made extensive reference to the "Healthy Workplace Bill" and explained that the office was a "toxic environment."  (*Id.*)  The distinction that Plaintiff drew in her June 2013 e-mail to Earle strongly suggests that (1) she had a basic understanding that workplace discrimination and retaliation on the basis of certain characteristics is prohibited, and (2) her other e-mails concerning her workplace difficulties were drafted with equal care.  Plaintiff's e-mails predating June 2013, while unequivocally

characterizing certain of her coworkers as having "brusque manner[s] and volatile temperament[s]," "would not have placed a reasonable employer on notice that [Plaintiff] thought the alleged mistreatment was motivated by [national origin,] race[,] or gender." *Douglass v. Rochester City Sch. Dist.*, 522 F. App'x 5, 8 (2d Cir. 2013) (summary order); *see also Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) ("[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII."); *Hua Lin v. New York State Dep't of Labor*, 11-CV-1186, 2013 WL 5755386, at *6 (N.D.N.Y. Oct. 23, 2013) (Sharpe, C.J.) ("The speaker must make clear to the employer that she is complaining of unfair treatment due to her membership in a protected class and that she is not complaining merely of unfair treatment generally.").

Despite its doubts, however, the Court is mindful that Plaintiff is not an attorney and was not represented by counsel at the time of the events at issue. Moreover, Plaintiff testified in her deposition that English is her second language and that she "learned [the word] 'retaliation' later" (i.e., at some point after her e-mail to Haggerty, dated May 3, 2013). (Dkt. No. 21, Attach. 4, at 126 [Plf.'s Depo. Tr.].) Plaintiff also testified that, "in every conversation [she] had with" human resources personnel, she "expressed" that she felt that she was being subjected to discrimination on the basis of her race and national origin. (*Id.* at 127.) In light of these considerations, and under the circumstances of this case, the Court concludes that Plaintiff has established (albeit barely) a genuine dispute of material fact as to whether her informal complaints in April and May 2013 constituted protected activities.

Second, for the reasons set forth in Defendant's memoranda of law, the Court concludes that Plaintiff's termination constituted an adverse employment action, but that her probationary evaluation report and her related continued employment on probationary status did not constitute adverse employment actions. (Dkt. No. 21, Attach. 1, at 29-30 [Def.'s Memo. of Law]; Dkt. No. 30 at 7-8 [Def.'s Reply Memo. of Law].) *See also, e.g., Smalls v. New York Hosp. Med. Ctr. of Queens*, 13-CV-1257, 2015 WL 5437575, at *7 (E.D.N.Y. Sept. 15, 2015) ("[T]he 2009 evaluation and ensuing three-month extension of a probationary period did not materially affect the terms and conditions of plaintiff's employment. Every new Assistant Supervisor is placed on probation, and though his probationary period was extended, plaintiff was still paid the same amount, retained the same title, worked the same hours, and held generally the same amount of responsibility while on probation. Moreover, there were no negative consequences because of this extension–it merely preserved the existing terms of [plaintiff's] employment.") (internal quotation marks omitted); *Hockeson v. New York State Office of Gen. Servs.*, 188 F. Supp. 2d 215, 221 (N.D.N.Y. 2002) (Kahn, J.) (concluding that, because there was "no firing, demotion, reassignment or change in [p]laintiff's responsibilities," plaintiff's allegations that "she received a poor evaluation from her supervisor that resulted in an extended probationary period" did not constitute an adverse employment action).

Third, the Court concludes that Plaintiff has failed to adduce admissible record evidence from which a rational fact-finder could conclude that Plaintiff's termination was causally connected to her informal complaints about her coworkers. "[A] plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Zann Kwan v.*

*Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (quoting *Univ. of Tex. Sw. Med. Ctr. v.*

*Nassar*, 133 S. Ct. 2517, 2526, 2533 [2013]). "'[P]roof of causation can be shown either: (1)

indirectly, by showing that the protected activity was followed closely by discriminatory

treatment, or through other circumstantial evidence such as disparate treatment of fellow

employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory

animus directed against the plaintiff by the defendant.'" *Hicks v. Baines*, 593 F.3d 159, 170 (2d

Cir. 2010) (quoting *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 [2d Cir. 2000]).

In this case, Plaintiff first complained about Martin and Mitchell on or around April 4, 2013, and

was advised that her employment was being terminated by letter dated June 28, 2013. *See,*

*supra,* Fact. Nos. 44-47, 133 in Part I.B. of this Decision and Order. In arguing that her

complaints were causally connected to her termination, Plaintiff relies upon the temporal

proximity of these events. (Dkt. No. 29 at 18 [Plf.'s Opp'n Memo. of Law].) Although these

events occurred somewhat close in time, there were "substantial intervening events" between

Plaintiff's first complaint and her termination which dispel any inference of a causal connection.

*Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("In this Circuit, an

inference of causation is defeated (1) if the allegedly retaliatory discharge took place at a

temporal remove from the protected activity; or (2) if there was an intervening causal event that

occurred between the protected activity and the allegedly retaliatory discharge."); *accord, e.g.*

*Li-Wei Kato v. Erie Cmty. Coll.*, 11-CV-0415, 2015 WL 3823719, at *12 (W.D.N.Y. June 19,

2015); *Joseph v. Marco Polo Network, Inc.*, 09-CV-1597, 2010 WL 4513298, at *18 (S.D.N.Y.

Nov. 10, 2010) ("An intervening event between the protected activity and the adverse

employment action may defeat the inference of causation where temporal proximity might

otherwise suffice to raise the inference.")  First, Defendant took the remedial step of assigning Plaintiff to a new supervisor (DeSalvatore).  *See, supra*, Fact. Nos. 60-64 in Part I.B. of this Decision and Order.  Second, with respect to Plaintiff's complaint that Mitchell was deleting her Dataquest e-mails, Defendant altered its usual practices with respect to Dataquest by giving another coworker (Schaffer) responsibility for handling Plaintiff's Dataquest e-mails.  *See, supra*, Fact. Nos. 106-111 in Part I.B. of this Decision and Order.  Third, on June 21, 2013, Plaintiff was given her probationary evaluation report, which would have continued her probationary status.  *See, supra*, Fact. Nos. 120-22 in Part I.B. of this Decision and Order.  Only after Plaintiff's altercation with Wagner on the same date that she received her final evaluation was her employment terminated (rather than continued).  The timing and sequence of these events does not reasonably support the conclusion that, despite taking steps to attempt to address Plaintiff's complaints about her coworkers (and deciding to continue her probationary employment), her employment was suddenly terminated as a "but-for" cause of her earlier complaints.[119]  *Zann-Kwan*, 737 F.3d at 845.

For each of these reasons, as well as those set forth in Defendant's memoranda of law, the Court concludes that Plaintiff has not presented sufficient evidence to satisfy the causation element of a claim for retaliation under Title VII.  Plaintiff's Title VII retaliation claim is therefore dismissed.

---

[119]    Although Plaintiff disputes Wagner's account of their altercation in Wagner's office suite on the evening of June 21, 2013, Plaintiff's version of the altercation does not suggest that she engaged in any additional protected activity which might have served as a basis for the termination of her employment shortly thereafter.  According to Plaintiff, she could "hardly get a word [out]," and she left Wagner's office upon his repeated demands that she do so.  (Dkt. No. 21, Attach. 4, at 187-88 [Plf.'s Depo. Tr.].)

### C. Whether Plaintiff's Title VII Hostile Work Environment Claim Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative. Plaintiff has unambiguously withdrawn her claim that she was subjected to a hostile work environment, and the Court finds such withdrawal appropriate under Fed. R. Civ. P. 41(a)(2). (Dkt. No. 29 at 3 [Plf.'s Opp'n Memo. of Law].) As an alternative basis for dismissal, the Court concludes that this claim must also be dismissed for the reasons set forth in Defendant's memorandum of law, each of which are unopposed by Plaintiff and possess facial merit. (Dkt. No. 21, Attach. 1, at 23-26 [Def.'s Memo. of Law].) *See, supra,* Part II.A. of this Decision and Order.[120]

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 21) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiff's Verified Complaint (Dkt. No. 1) is **<u>DISMISSED</u>**; and it is further

**ORDERED** that the Clerk of the Court shall issue a Judgment for Defendant and close this action.

Dated:     January 13, 2017
           Syracuse, NY

                         Hon. Glenn T. Suddaby
                         Chief U.S. District Judge

---

[120]    As noted above, Defendant also argues that, if Plaintiff's claims are not dismissed, the Court should hold that Plaintiff has failed to mitigate damages for at least a portion of the period of time for which she seeks to recover. (Dkt. No. 21, Attach. 1, at 34-35.) Although Defendant's argument appears to have merit, the Court has no occasion to reach it.